**STATE OF WISCONSIN   CIRCUIT COURT   DODGE COUNTY**

**BRANCH III**

─────────────────────────────────────────

**STATE OF WISCONSIN,**

          **Plaintiff,**

   **-vs-**                          **Case Nos. 2015-CF-256**

**JARED L. SPENCER,**                **2015-TR-6278**

          **Defendant.**

─────────────────────────────────────────

**Sentencing Hearing**

─────────────────────────────────────────


          **HONORABLE JOSEPH G. SCIASCIA**

                **Judge Presiding**


<u>APPEARANCES:</u>

   **ATTORNEY KURT F. KLOMBERG,** District Attorney

for Dodge County, on behalf of the State of

Wisconsin;


   **ATTORNEY CHARLES W. GIESEN**, on behalf of, and

with, Defendant, Jared L. Spencer.


Date of Proceedings:  **July 21, 2017.**

─────1─────

1           THE COURT:  Good morning, everyone.  We

2    have two cases that will be called

3    simultaneously here; 15-CF-256, State of

4    Wisconsin and Jared Spencer and 15-TR-6278,

5    Dodge County and Jared Spencer.

6           Mr. Spencer is here in person in custody

7    with his attorney, Mr. Giesen.  District

8    Attorney Klomberg is here for the State.

9           We have substantial time set aside for

10   this case today, but as always, we do not have

11   unlimited time.  I believe a lot of people want

12   to address the Court and I want to hear

13   everything that everyone wants to say.

14           Since the lawyers are trained, I am going

15   to ask them to be as efficient as possible in

16   making their remarks.  I'm going to give them

17   all the time they need to make their point.

18           I need some time at the end.  So please

19   understand that I am responsible for explaining

20   the discretion that I exercise in sentencing and

21   I am going to need a little bit of time at the

22   end.  So hopefully everyone will be satisfied

23   with the input that they have had.

24           We will break for lunch at 11:45 and

25   reconvene at 1:00 unless I hear a violent

```
 1    objection.

 2              ATTORNEY KLOMBERG:  I don't have a

 3    violent objection, Judge, but what I would ask,

 4    Mr. Giesen and I had a brief discussion about

 5    timing and we have six-and-a-half hours set

 6    aside for this.  I don't think we are going to

 7    need that full amount of time.  In fact, I think

 8    it's going to be considerably less than that.

 9              What I request of the Court is that once

10    my remarks begin, and I expect that they begin

11    in the morning, that I finish my remarks without

12    having them broken.  And if we have to break a

13    little early for lunch to start my remarks after

14    lunch or go into the lunch hour a little bit

15    that would be great, but I have prepared remarks

16    and I don't want to be told half way through

17    that I have to stop and pick it up again after

18    lunch.

19              THE COURT:  We'll try to accommodate you.

20    We have a lot of people here who want to go

21    someplace for lunch.  My idea is to break at

22    quarter to 12:00 so they can beat the rush hour.

23    And we don't have unlimited options here in town

24    for lunch.

25              So I will try to accommodate you.  I
```

—3—

understand your position, but I don't know, it
        may or may not be feasible.  I'll see what I can
        do.
                ATTORNEY GIESEN:  Your Honor.
                THE COURT:  You may go.  Go ahead,
        Counsel.
                ATTORNEY GIESEN:  I was just going to say
        in the interest of saving Courtroom time, I have
        provided the Court with a number of documents
        and submissions in advance of today.
                THE COURT:  Right.
                ATTORNEY GIESEN:  And I just wanted to be
        certain that the Court has had an opportunity to
        receive and review all of those.
                THE COURT:  I read the two letters that
        were sent yesterday.  And you sent me two
        letters.  Let me just make sure I have them all.
                I read everything that's been filed at
        least once up to today, which is part of what I
        wanted to say here in a minute.
                I have your letter of July 20th.  I have
        your sentencing report the day of June 26th.  I
        have your letter of July 12th.  I had printed
        off some cases.  I have your letter of
        July 17th.  And two letters of July 17th with

```
 1    attachments which included the resources
 2    available at the prison system.  And then I did
 3    get the letters from Mr. Spencer's mother and
 4    step grandmother yesterday.  I read those.  So
 5    did I miss anything.
 6         ATTORNEY GIESEN:  No, that is everything.
 7    Thank you, Your Honor, we appreciate the Court
 8    reviewing that.
 9         THE COURT:  You may notice that I have
10    some notes here.  There is a substantial body of
11    materials that have been sent and I wanted to be
12    able to access information.  So I typed up some
13    notes.  I do not have a decision here.  So if
14    anybody thinks that I walked in the Courtroom
15    and already had my mind made up, it's not true.
16    Which is why I wanted to emphasize that I do
17    want to make sure everybody gets time to say
18    what they want to say.
19         Do we have a stipulation as to
20    restitution and pretrial incarceration?
21         ATTORNEY KLOMBERG:  Restitution the only
22    request is a $38.98 from Mills Fleet Farm.  I
23    don't know if that's agreed to.
24         ATTORNEY GIESEN:  They have that.  There
25    wasn't a loss.
```

—5—

```
 1              ATTORNEY KLOMBERG:  That's the request I
 2      have.  I do not know.
 3              That's the request that I have if there
 4      is a dispute, we have a Hearing over $38.
 5              THE COURT:  It may be that because this
 6      is the box of ammunition, I assume?
 7              ATTORNEY KLOMBERG:  It is.
 8              THE COURT:  Maybe because it left the
 9      store, they are not allowed to take it back.
10              ATTORNEY GIESEN:  If that's the case, we
11      will stipulate to that.
12              THE COURT:  Now, are you telling me that
13      there is no restitution claim for any other
14      medical bills or anything like that?
15              ATTORNEY KLOMBERG:  I haven't received
16      any.  And I have requested that that be checked
17      into.  I haven't received any.  Obviously, the
18      victims could make a request within 60 days of
19      the sentencing whether the Court could
20      accommodate the Hearing or not is --
21              THE COURT:  Well, my preference is to
22      have all those issues addressed at sentencing,
23      but if a request is filed in a timely manner and
24      if the parties can't agree, a Hearing will be
25      scheduled.
```

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 6 of 117   Document 6-14

```
 1              Pretrial incarceration credit?
 2              ATTORNEY KLOMBERG:  It's 738.
 3              THE COURT:  Agreed?
 4              ATTORNEY GIESEN:  Yes, Your Honor.
 5              THE COURT:  So Ordered.
 6              The next thing on my list, any challenges
 7      or corrections to the PSI?
 8              ATTORNEY KLOMBERG:  The State doesn't
 9      have any.
10              ATTORNEY GIESEN:  No challenges to the
11      content, per se.
12              THE COURT:  You are talking about the
13      facts and I realize that you reserve your right
14      to challenge the recommendation.
15              ATTORNEY GIESEN:  Yes.  And we don't
16      believe the data supports the recommendation.  I
17      will address that.
18              THE COURT:  Okay.  Now, I would like to
19      get an idea who wants to address the Court and
20      do this in some kind of orderly manner.
21              We have a roster of who wishes to address
22      the Court.  Do we have some kind of
23      understanding what order they are going to be
24      testifying in?
25              ATTORNEY KLOMBERG:  Judge, my
```

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 7 of 117   Document 6-14

```
 1      understanding is the only victim that's going to

 2      make a statement is Mr. Kruse.  He has requested

 3      to make his statement from Counsel table.  I

 4      would ask that Victim Impact Statement, that

 5      Victim Impact Statement go after any character

 6      witness, fact witness that would be presented on

 7      either side.  The State is not going to be

 8      presenting any fact or character witness.

 9           THE COURT:  So you want to allow

10      Mr. Spencer to present his supporting witnesses

11      first and then Mr. Kruse?  Is it Kruse or Kruse?

12           ATTORNEY KLOMBERG:  Kruse.

13           THE COURT:  I want to make sure I get it

14      right.

15           Mr. Giesen, who do you wish to call?

16           ATTORNEY GIESEN:  Mr. Spencer's father,

17      John; Mr. Spencer's mother, Peggy Andrew; his

18      step sister, Angela; his grandmother is also

19      present, but she doesn't wish to address the

20      Court.

21           There are other family members it seems a

22      little unorthodox that the State doesn't go

23      first.

24           THE COURT:  I don't know how much

25      difference it really makes.
```

—8—

```
 1            ATTORNEY GIESEN:  Okay.
 2            THE COURT:  If you think your toes are
 3       being stepped on, we'll do it the other way.
 4            ATTORNEY KLOMBERG:  I'm not asking
 5       Counsel to argue first.  I just want the fact
 6       witnesses to be done first.
 7            THE COURT:  We're talking about the lay
 8       people.
 9            ATTORNEY KLOMBERG:  I would certainly put
10       my mine on first, if I had any.
11            THE COURT:  Okay.  So you have the
12       victim.
13            ATTORNEY KLOMBERG:  But the victim is not
14       going to be sworn.  He doesn't need to be sworn,
15       he is not subject to examination.
16            THE COURT:  I am not sure that any of
17       them need to be sworn.
18            ATTORNEY GIESEN:  Correct.
19            THE COURT:  So is it John Spencer and his
20       mom, Ms. Andrew, right?
21            ATTORNEY GIESEN:  Correct.
22            THE COURT:  And the stepsister.
23            ATTORNEY GIESEN:  Yes.
24            THE COURT:  And as far as you know, are
25       there any others?
```

1    ATTORNEY GIESEN:  No, Your Honor.

2    THE COURT:  So is there anything else we

3    need to address before we allow the lay people

4    to come in and make their statement?

5    ATTORNEY KLOMBERG:  I don't think so,

6    Judge.

7    ATTORNEY GIESEN:  Just following up on

8    the Court's comments, I assume these will just

9    be statements to the Court and not testimony or

10    Cross-Examination?

11    THE COURT:  It's done different ways.

12    They are not witnesses, they are not on trial,

13    it would be fair to allow both sides to ask them

14    some questions, right, if they wanted to.

15    That's commonly done.

16    ATTORNEY KLOMBERG:  I guess my thought

17    is, my practice in other Courts practices have

18    always been that when they are being put on for

19    character reasons, they're testifying providing

20    evidence to the Court and that should be sworn

21    testimony subject to Cross-Examination.

22    I don't know that I am going to

23    Cross-Examine them, but --

24    THE COURT:  Well, it can be done either

25    way.  If there is a request that they be sworn

—10—

```
 1          they will take the witness oath.  It's fair.  If
 2          you offer something, it's got to be reliable.
 3          And the Court and the parties are entitled to
 4          know that they are doing it under oath.
 5                    ATTORNEY GIESEN:  Thank you.
 6                    THE COURT:  So do we have an
 7          understanding as to who wants to be called first
 8          or who wants to present their statement first?
 9                    ATTORNEY KLOMBERG:  While Mr. Giesen is
10          working that out, can we get the computer going?
11          It takes a very long time to load because of the
12          software.
13                    THE COURT:  Okay.
14                    ATTORNEY KLOMBERG:  If they want to
15          commence.
16                    THE COURT:  Do you have somebody that you
17          would like to call first?
18                    ATTORNEY GIESEN:  Yes.  We would ask
19          John Spencer.
20                    THE COURT:  Mr. Spencer.
21                    THE WITNESS:  Yes, sir.
22                    THE COURT:  Please come up to the witness
23          stand and raise your right hand.
24                              (Witness sworn.)
25
```

—11—

```
 1                        JOHN SPENCER,
 2       called as a witness herein, having been first
 3       duly sworn, was examined and testified as
 4       follows:
 5                        EXAMINATION
 6  BY THE COURT:
 7            Q.   Please have a seat.
 8                 Mr. Spencer, you have a chance to make a
 9       statement to the Court.  Take a deep breath and
10       relax.
11                 Please be aware of the fact that the
12       microphone is movable and that if you don't
13       speak really close to it, it won't pick up.
14       Okay?
15            A.   Okay.
16            Q.   The lawyers will have a chance to ask you
17       some questions when you are finished and I might
18       have some.  Okay?
19            A.   Okay.
20            Q.   Start by stating your name and address.
21            A.   My name is John Spencer.  My address is
22       2990 Austin Street, Fitchburg, Wisconsin.
23            Q.   And you are Jared's father?
24            A.   Yes, I am.
25            Q.   You now have an opportunity to address
```

—12—

1    the Court with regard to sentencing.  You have

2    the floor.

3        A.    Your Honor, all I would like to speak to

4    is Jared now versus Jared two years ago when I

5    visited him the first time at this facility.

6            Today he is coherent, he puts together

7    excellent thoughts.  That first time, Jared

8    wasn't there.  I didn't hardly recognize him.  I

9    think that the work that Mendota put in in

10   stabilizing his medication and stabilizing him

11   has shown brightly over the last three or

12   four months since he has been back here.

13           I can't tell Mr. Kruse how sorry I am

14   about what happened.  My family is -- feels

15   terrible about it, but we can't change the past.

16   We can only look to make the future better.

17           I don't believe the type of sentence that

18   the DA is asking for benefits anyone; not

19   society, not Jared, not our family.  And I don't

20   believe the victim's family benefits from it.

21           Jared needs treatment.  Jared needs to be

22   in therapy working on maturing.  Those are the

23   things that I want to bring to light here.

24       Q.    Anything else you want to say?

25       A.    No, sir.

—13—

```
 1              THE COURT:  Mr. Giesen, do you have any
 2       questions for this gentleman?
 3              ATTORNEY GIESEN:  Yes.
 4                         EXAMINATION
 5  BY ATTORNEY GIESEN:
 6       Q.    John, you have been here for Jared for
 7       every Court appearance, is that correct?
 8       A.    Every Court appearance and once a week
 9       for the last two years on a Thursday to visit.
10       Q.    If the Court were to see fit to place
11       Jared on Probation with whatever rigorous
12       conditions it felt appropriate, would you assist
13       in seeing to it that those conditions were
14       complied with?
15       A.    In any way I could, yes.
16       Q.    If he deviated from any conditions, would
17       you take it upon yourself to advise his
18       supervising agent of any such problem?
19       A.    Yes, I would.
20              ATTORNEY GIESEN:  Thank you.  I have
21       nothing further.
22              ATTORNEY KLOMBERG:  I don't have any
23       questions.
24              THE COURT:  Thank you, sir.  Your input
25       is very important to the Court.  You may step
```

```
 1        down.
 2                THE WITNESS:  Thank you, Your Honor.
 3                THE COURT:  You're welcome.
 4                                (Witness excused.)
 5                THE COURT:  Mr. Giesen?
 6                ATTORNEY GIESEN:  Yes, we would call
 7        Angela Spencer and ask that she address the
 8        Court.
 9                THE COURT:  Good morning.  Please come up
10        to the witness stand and raise your right hand.
11                                (Witness sworn.)
12                          EXAMINATION
13   BY THE COURT:
14        Q.   Please have a seat.  Please feel free to
15        adjust the microphone and to speak directly into
16        it.  Take a deep breath and relax.  This is your
17        opportunity to address the Court.  When you are
18        finished, the lawyers and I might have some
19        questions for you.  Okay.
20                You can start by stating your name and
21        address for the record.
22        A.   Okay.  My name is Angela Spencer.  My
23        address is 5714 Crab Apple Lane, Madison,
24        Wisconsin 53711.
25        Q.   How are you related to Jared?
```

—15—

A.    I am Jared's only sister.  We have the same father.  Jared and I are five years apart, but we have a very close relationship.  When I need something, I can call him and he is always there for me.  When I am sick, he brings me soup and a heating pad and tucks me in.  He calls and checks on me.  We talk about anything and everything.

I have two daughters, they are 13 and nine.  My nine-year-old has ADHD like Jared does.  Jared has been so helpful in helping me navigate the situation of having a daughter with emotional and behavioral problems.  He talked to me about how important it is to get her help and to get her medicine and talk to me about the differences that he would feel growing up in school of when he was medicated versus when he wasn't.

He has more patience with my youngest daughter than I have ever seen anyone have.  And she worships him.  And they miss him so much.

When Jared was in elementary school I recall an incident where he had locked himself in the principal's office and called me and asked me to come pick him up because the

teachers had surrounded him and he was scared.

Q.   Say that again, please.  The teacher
what?

A.   Because they had -- he was having a
behavioral issue and they have a response team
that comes.  And they all approached him and he
was scared.  So he ran into the room, locked the
door and called me and asked me to please come
save him from that situation.  I wish that I
could save him from this situation.

When Jared takes his medicine, his anxiety and
impulsivity are drastically improved.  Jared was
young, just 17 when this happened.  His brain
was not fully developed when this incident took
place.

I'm so sorry to the victim and his family and
I truly hope that the victim is able to fully
heal, recover from this and go on to have a
healthy and happy life.

I also hope that Your Honor will consider the
circumstances and understand that Jared is very
young and he needs help.  Please give him the
punishment that will allow him to be
rehabilitated and not thrown away with no hope
for a future.  I know he can become a

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 17 of 117   Document 6-14

productive, healthy and contributing member of
society because he is just a sweetheart.  He
really is if you knew him.  And this is not
indicative of the -- the incident is not
indicative of the person he truly is.

   Not to say he doesn't take responsibility,
because he does, but I think there was a lot of
additional circumstances.  But I just really
want my brother to be able to be punished and
rehabilitated and move on and contribute and
continue to be the brother I can count on and
the uncle that my girls can count on.

          Thank you.

          THE COURT:  Attorney Giesen.

          ATTORNEY GIESEN:  I have no questions.

          THE COURT:  Attorney Klomberg?

          ATTORNEY KLOMBERG:  No questions.

          THE COURT:  Thank you, ma'am.  Your input
is very important.  You may step down.

          THE WITNESS:  Thank you.

                              (Witness excused.)

          ATTORNEY GIESEN:  Jared's mother, Becky
Andrew would like to address the Court.

                              (Witness sworn.)

```
                        EXAMINATION

BY THE COURT:

        Q.   Please have a seat.  Good morning, ma'am.

        A.   Good morning.

        Q.   You heard the suggestions I gave to the

    other witnesses to try to relax, use the

    microphone.

             This is your chance to make a statement.

    So you can start by stating your name and

    address for the record.

        A.   My name is Peggy Andrew,

    2306 Westchester Road, Fitchburg, Wisconsin.

        Q.   Okay.  You now have the floor.  You may

    proceed.

        A.   The day after this happened, my family

    and Jared's friends all gathered at my house.

    And everyone said that it had to have been

    someone else in the car because Jared would

    never hurt a fly.  And they were stunned.  Those

    kids gathered around me for months.

             Jared has always been my rock and my

    support.  And I have been his.  I foster

    Greyhounds and take animals into my home to heal

    them.  Jared has always helped me with that.

    And he has been kind and gentle and patient with
```

all of the Greyhounds and special animals that
we have had in our home.

I also, uhm, have always had my home open
to any of the kids or people that needed a soft
place to land for a while.  Not just animals,
but people that need some time to get back on
their feet.  And Jared has always been there for
me with that and been kind and supportive of the
people that have come through our house.

It always hasn't been easy, but he has
always been up to the task of helping.  I really
need him home, on his medication and in therapy.

I think this has been a tough chapter in
his life, but it's not the end of his book.  And
I'm -- I spoke to one of the CO's yesterday when
I came to pick up some of Jared's property and
she remarked to me what a drastic difference
there was between the Jared that came to them
two years ago and who he is now and the maturity
and growth that they have seen.

This has been very difficult for my
family.  And we all will stand beside Jared to
help him become a productive part of our
society.  I think putting him away somewhere
will -- make his ability to be productive go

```
 1        actually backwards.  Because I worked really

 2        hard and his father and I have worked really

 3        hard together to try and raise Jared.  Even

 4        though we weren't together anymore, we stood

 5        together along with our new spouses and our new

 6        families together.  Because it was about him not

 7        about us.  And he still needed all of us.  And

 8        he still has all of us.

 9             THE COURT:  Anything else you want to

10        say?

11             Attorney Giesen.

12             ATTORNEY GIESEN:  Yes.  Thank you.

13                    EXAMINATION

14   BY ATTORNEY GIESEN:

15        Q.   Ms. Andrew, you mentioned a conversation

16        that you had with a CO regarding Jared's change

17        in behavior in the two years since he has been

18        here.  Can you tell us what is a CO?

19        A.   The corrections officer.

20        Q.   That would be a Dodge County jailer?

21        A.   Yes, I was there yesterday and I was -- I

22        send Jared a lot of books because he likes to

23        read.  And so when I pick up his books, it's

24        usually, uhm, very weighty and so they bring it

25        out in a cart for me and help me load it in the
```

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 21 of 117   Document 6-14

```
1       car.

2              Q.    And she expressed those observations?

3              A.    Absolutely.

4              Q.    Thank you.

5                    ATTORNEY GIESEN:  I have nothing else.

6                    THE COURT:  Attorney Klomberg.

7                    ATTORNEY KLOMBERG:  Nothing.

8                    THE COURT:  You can step down, ma'am.

9       Thank you for your statement.

10                   THE WITNESS:  Thank you.

11                               (Witness excused.)

12                   THE COURT:  Anyone else?

13                   ATTORNEY GIESEN:  No, Your Honor.  We

14      would have submitted some written statements in

15      support of Jared.  And at this point the

16      Court -- Richard Shaller who worked for the

17      Department of Corrections was an Officer for 28

18      years.  And he noted that Jared's behavior

19      exhibited dramatic improvement while he was at

20      Mendota Mental Health and feels that he would

21      benefit from the a comprehensive treatment

22      program certainly would be more rehabilitative

23      and useful than incarceration and the Court has

24      already read the other submissions in that

25      regard.
```

```
 1              THE COURT:  Okay.  So that would leave
 2       Mr. Kruse.
 3              ATTORNEY KLOMBERG:  Actually, Judge.  I
 4       was handed a note during the presentation.
 5       Bryce Berger, another one of the victims is
 6       present and he also has decided he would like to
 7       make a statement.
 8              Mr. Kruse is going to go first, I
 9       believe.
10              THE COURT:  Come up to the -- you can do
11       it there.  You have to take the oath.
12                                  (Witness sworn.)
13                      EXAMINATION
14   BY THE COURT:
15       Q.   Mr. Kruse, please have a seat.  Draw the
16       mic up, take a deep breath and relax.
17              Start by stating your name and address
18       for the record.
19       A.   My name is Andrew Kruse.  My address is
20       W-210 N-16682 Western Avenue, Jackson,
21       Wisconsin.
22       Q.   And you now have the opportunity to
23       address the Court.  You have the floor.
24       A.   Thank you, Your Honor.
25              Uhm, I have a statement written and I'll
```

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 23 of 117   Document 6-14

1  refer to that and read that, but I do have a few

2  thoughts, if I may, before I do that.

3       Uhm, I have thought about quite a bit

4  lately what I would prefer to happen today.

5  Those who know about the situation know us and

6  care about our outcomes, they ask what I would

7  hope would happen today.  And I have a very good

8  answer, Your Honor.  Uhm, I'm glad you are

9  making that decision and not me.  Because quite

10  frankly, to be blunt, what I want is impossible.

11  And I know that.

12       Of course, I would like for this to not

13  have happened.  And I'm sure many others in the

14  Courtroom feel the same way, but that isn't

15  possible.  So I think this is a great

16  opportunity for me to say something that my

17  parents taught me, I have taught my children and

18  that's that the Good Lord, he teaches us to

19  forgive.  And that is exactly what we do as

20  Christians.  I want my children to hear that

21  message today.

22       And, of course, along with that, the

23  consequence of the actions of Jared's actions.

24  I think the most important thing that you can

25  hear and this Court could hear are, of course,

1    in relation to that, the impacts that this has

2    had on me and, of course, my family, most

3    specifically my wife and my children as referred

4    to in my statement.

5         So regarding Jared's decision to shoot

6    me, there was indeed life before the shooting

7    and now there is life after.  They are very

8    different.  Though my life is irreversibly

9    changed as a result of Jared's decision to shoot

10   me, I am grateful, of course, to still have it.

11        It's difficult to fully express the full

12   impact that this event has had on my life and

13   the lives of my wife and children because it is,

14   of course, far reaching and unfortunately still

15   developing.

16        I'm still dealing and wrestling with the

17   daily psychological changes that have come as a

18   result.  And those psychological changes have

19   continued to impact my family in a manner of

20   ways.

21        In the days following the shooting, I

22   experienced tremendous physical pain.  It was

23   poorly regulated for the first eight weeks until

24   the doctors were able to find the right amount

25   of medication for nerve pain.  This caused many

sleepless nights counting the minutes until the
next dose of medication.

And made further sleepless as our
children began to suffer from nightmares of bad
men with guns.  They were scared to come today,
as a matter of fact.  These nightmares continued
for over a year.  All three of my children have
struggled to understand why someone would do
this.  And they ask us about their own safety
when we drive anywhere, large cities.

After this happened, they learned we were
moving closer to Milwaukee.  Their classmates
told them Milwaukee is where shootings happen
and that, of course, further upset them.

Ultimately, in regards to my children the
phrase my dad got shot or the news about this
event is the first thing that they share with
anyone they meet.

My wife has been remarkable.  She
certainly cared for us physically and
psychologically through all of this.  I'm
grateful and humbled by her ability to do that.

While experiencing her own levels of
anxiety in the aftermath of the shooting, which
she hasn't benefitted from treatment as I have.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 26 of 117   Document 6-14

```
 1      She drove me to seemingly countless
 2  appointments, dressed my wounds and helped me
 3  during panic attacks and moments of crisis while
 4  simultaneously managing our home and our daily
 5  lives and making sure we were all fed and
 6  unquestionably loved.  All done through selfless
 7  effort.  And the impact on her has been
 8  tremendous.
 9          So, I mentioned psychological impacts.
10  I'll speak to those.  My first panic attack
11  occurred almost exactly four weeks after the
12  shooting.  And it was as if that first panic
13  attack opened the flood gate.
14          I had experienced some flashbacks and
15  sensitivity to things like loud noises after the
16  shooting, but all of that would pale in
17  comparison to the diagnosis that I received for
18  PTSD.
19          My arm hurt for a long time.  It took
20  almost a year for me to stop taking medication
21  to get through my day regarding physical pain.
22  I still have numbness, stiffness, a loss of
23  strength in my dominant hand and my arm and my
24  shoulder, but what I have experienced
25  psychologically has been far more life changing.
```

—27—

1      It was clear that my life would be

2   changed as a result of being shot by Jared, but

3   the future of my job was in question at that

4   time.  I had very serious injuries, but I truly

5   had no idea how much my life would change due to

6   the psychological impacts as a result of the

7   shooting.

8      So what I experience today is fear of

9   many things that really truly pose no threat.

10  I'm hypervigilant in crowded areas like

11  departments stores, parking lots and

12  unfortunately church.  I struggle most in a room

13  with people around me.

14      A lot of noises like thunder, fireworks

15  and slamming car doors cause flashbacks and

16  anxiety.  And I am hyper-attuned to my personal

17  well-being.  A slight inconvenience can cause a

18  panic and heightened sensitivity.  Anything that

19  alters my personal state, even a cup of coffee

20  causes me to feel very anxious about my health.

21      Essentially, I feel like the world's

22  biggest hypochondriac.  I'm constantly worried

23  about the pace and control of my breathing.

24  Most likely because the ability to control my

25  breathing is sort of my greatest defense against

—28—

a lot of the symptoms that I experience.

I still experience nightmares of being shot, reliving the sensation. I have difficulty sleeping most nights, several nights a week. And I spend a lot of time in the middle of the night getting up and checking to see whether or not the doors are locked for fear of something like this or something bad happening to us again.

Whenever I head out to the store or work or home, I'm constantly assessing my surroundings and creating plans in my head or what I will do if gunshots ring out again or something bad starts happening to myself or my family.

There are some other PTSD symptoms that are extremely frustrating unrelated to panic and anxiety that I do experience. The best words I found to define that are mental fog. Whether I am at work or at home, I have a hard time finding the words to speak clearly when I am not reading a written statement, of course. And it's difficult to come up with new ideas and I need to take frequent breaks when I need to focus.

```
 1            The hard truth, the hard truth in my life
 2       in all this is my right arm won't ever be the
 3       same.  And neither will my head.  The
 4       psychological impact of the shooting extended
 5       into my personal relationship and made it
 6       difficult for me to be fully mentally present
 7       with my family, friends and colleagues.
 8            And finally, I live with fear and will be
 9       ever vigilant over the threat of something like
10       this happening again.
11            In regards to today's outcome, again, I
12       know that regardless of any circumstances or
13       detail, I'm fearful of Jared Spencer's return to
14       society.  I fully expect that day to come.  And
15       intellectually I fully understand that it must,
16       but I share the reality of my situation and
17       condition when I say that I am profoundly
18       frightened by it.
19            There is no question that this has
20       permanently changed my life and the life of my
21       family.  I'm thankful to God that we are still
22       all together.  We trust God's judgment and will
23       for us and we know that this is part of his will
24       and we pray for the strength to continue and he
25       continues to grant it.  That's all I have.
```

```
 1            THE COURT:  Thank you, sir.

 2            Mr. Giesen.

 3            ATTORNEY GIESEN:  Yes, I would like to

 4       express to Mr. Kruse that Jared has asked me to

 5       express to you that he bears no personal

 6       animosity towards you, whatsoever.  He is deeply

 7       sorrowful for your situation and wanted me to

 8       tell you that he regrets the consequences, the

 9       results.  He had no intent to harm you on the

10       day and thinks every day about the suffering

11       that you are going through.

12            THE WITNESS:  Thank you.

13            THE COURT:  Mr. Klomberg.

14            ATTORNEY KLOMBERG:  No questions.

15            THE COURT:  Thank you, sir.

16                                (Witness excused.)

17            ATTORNEY KLOMBERG:  Mr. Berger would like

18       to make a statement.

19            Your Honor, Mr. Berger has asked not to

20       give out his address.  I ask that you identify

21       him in a different fashion.

22            THE COURT:  Good morning, sir.  Please

23       feel free to adjust the microphone.  You have to

24       stand up and raise your right hand and take the

25       oath, please.
```

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 31 of 117   Document 6-14

```
 1                                    (Witness sworn.)
 2                    BRYCE A. BERGER,
 3      called as a witness herein, having been first
 4      duly sworn, was examined and testified as
 5      follows:
 6                        EXAMINATION
 7   BY THE COURT:
 8      Q.    Now, Mr. Berger, if you don't want to
 9      give out your address, can you tell us what city
10      you live in?
11      A.    Yes, that's fine.
12      Q.    Okay.  So would you please state your
13      name and city of residence for the record.
14      A.    Bryce Berger and Rio, Wisconsin.
15      Q.    You now have an opportunity to address
16      the Court you may proceed.
17      A.    First of all, I want to express my
18      sympathy to the Spencer family.  I understand to
19      a certain extent what you guys are going
20      through.  You may or may not know in my
21      profession I'm a police officer.  With that
22      being said, I have kind of seen both sides of
23      what's transpiring today.
24            And one thing that I did notice that I
25      want to bring to the Court's attention and to
```

1     everybody in here, there are many, many, many
2     victims in this incident.  Not only myself, not
3     only Mr. Kruse, Kruse's children, Kruse's
4     family.
5             Every single person with Mr. Spencer's
6     actions that day started a chain of events.  The
7     officers that had to initiate a traffic stop
8     knowing that there was a loaded handgun in that
9     car put everybody at risk; their families, every
10    person in the parking lot when that shot was
11    fired.  The victim, the store itself.
12            I just want to make sure that everybody
13    knows that I heard a lot of comments today just
14    regarding to the specific individual that was
15    shot.  Okay.  Those actions are unexplainable.
16            The fact that he wasn't on his medication
17    and I get that, I see a lot of that in my
18    profession, not properly medicated, not taking
19    them, but whose responsibility is that?
20            He is 17.  Are there family members that
21    are going to assist with that?  One way that I
22    believe that that would be easily monitored
23    would be to be incarcerated.  For how long, I
24    have no idea.  That's not my decision to make.
25            But someone made a decision that day to

put a loaded handgun in the middle of the front
two seats.  Someone made a decision that day to
go get or go steal ammunition from a store in
Beaver Dam, Wisconsin that fits the handgun that
was in the center console.

What was going to happen?  What did we
possibly prevent from happening later on that
day?  And one thing that I really struggled with
personally is that I made the decision coming
here, that I probably wasn't going to speak and
just let things play its course, but I didn't
want to regret the opportunity to make the
situation of giving everybody my thoughts and
everybody thinking outside of the box, because
we are here focusing on everything.  And I think
everything needs to be brought up.

And I'm probably going to forget some
things, but I don't have nothing laid out in
front of me that I was going to say.  I do know
that in the future, that I wish we could just
skip over July.  I have a lot of bad things,
tragedies in July.  Several dates in July are
not good for me.  The passing of my father last
week.

Another thing that I told myself

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 34 of 117   Document 6-14

before -- as soon as getting back on scene, I am
a law enforcement officer, I made a decision
that I was not going to carry off duty.  I don't
even carry a badge, ID, nothing.  And I kind of
went through there is a lot of issues with
thinking in my mind that in the situation as
such happened with Mr. Kruse, if I would be able
to live with it.

        And I know for a fact that if I was
carrying that day off duty, the outcome may have
been different.  And I personally believe the
only reason why Mr. Spencer did not shoot the
first time when he pulled the gun when I was two
feet away from the window of his car is because
of the glass that separated us in between and he
didn't know what was going to happen.

        At that point in time, if I would have
been carrying off duty, I don't know.  I'm glad
within reason that no one was killed.  The
situation ended as well as it could have, I
guess, if he would have missed.  But when you
back out of a parking stall, have an out in a
vehicle, pull forward, stop, roll down the
passenger side window, point the gun at three
people that are standing side by side trying to

call 911.  And hopefully no one ever has a
bullet go right past my chest into Mr. Kruse's
wrist through and through into his shoulder
because if that would have hit me, it would have
been through and through from shoulder to
shoulder right through my chest cavity.

And then, yes, I'm trained to remember
license plates, description of the gun,
direction of travel and stuff like that in
relaying that to an individual who is going into
shock, because I'm kneeling over him putting
pressure on his wound, my hand covered in blood
and I am not bringing up any suggestions here,
but bare hand exposed to blood numerous
infectious, diseases, okay.  And I feel
confident that I am okay with that.  Okay, but
these are some other things that people don't
think of.

I guarantee Mr. Spencer didn't think of
that going to Fleet Farm, I'm just going to
steal this stuff and then, you know, whatever is
going to happen.  Every single person coming
there responding.  Everybody was put at risk.
The behavior of Mr. Spencer leaving the parking
lot at such a high rate of speed.  There is a

—36—

lot of victims here.

   And I want to personally apologize to
Mr. Kruse and his family for what you guys are
going through.  And I'm struggling with it
basically daily that I could have possibly
stopped it if I would have carried off duty.

   You still have your job.  You still
probably will be able to go into a Fleet Farm.
And for the kids.  And your whole family.  And I
am sorry to the Spencer family for what
happened.

   I just want him to get the proper
treatment and I think the proper treatment would
be in a more monitored location which I believe
would be incarceration, not home treatment.  I
understand people promised they will see and
report stuff if he is on Probation, I firsthand
witnessed that it doesn't work so well in Law
Enforcement.  There are a lot of things that
happen that can't be monitored at home or, you
know, even a group home and stuff like that.
It's really tough.

   I guess that's it, Your Honor.

   THE COURT:  Thank you, sir.

   Mr. Giesen.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 37 of 117   Document 6-14

```
 1            ATTORNEY GIESEN:  Thank you.

 2                      EXAMINATION

 3   BY ATTORNEY GIESEN:

 4       Q.   Mr. Berger, thank you for your remarks.

 5   I would just like to clarify one thing.  You

 6   made reference to the officers who pulled

 7   Jared's vehicle over after this incident.

 8            Jared did surrender peacefully, did he

 9   not?

10       A.   I wasn't there, but the whole idea being

11   a Law Enforcement Officer it isn't.  Nothing is

12   peaceful about having a gun in a vehicle going

13   down the road who did not stay.

14       Q.   Sir, you have no information that he

15   brandished the weapon, showed that to the

16   officers or resisted them in fashion, do you?

17       A.   I am just making a point that a gun in a

18   car leaving the scene of a shooting is not a

19   very easy, calming situation for anybody to deal

20   with.  That was my point.

21            ATTORNEY GIESEN:  Thank you.

22            THE COURT:  Attorney Klomberg?

23            ATTORNEY KLOMBERG:  Nothing.

24            THE COURT:  Thank you, sir.  Your input

25   is very much appreciated by the Court.
```

—38—

```
 1                              (Witness excused.)
 2          THE COURT:  Mr. Klomberg, can you get it
 3     done or what do you think?
 4          ATTORNEY KLOMBERG:  Well, Judge, I expect
 5     my remarks will probably very well may be an
 6     hour in length.  I think we can be done before
 7     noon.
 8          THE COURT:  Start now.
 9          ATTORNEY KLOMBERG:  Judge, first I want
10     to deal with the second charge or the second
11     conviction that the Court is sentencing on
12     today.  Because it's really not the focus of
13     what we are dealing with in the TR situation.
14          In 15-TR-6278, we are recommending $150
15     fine plus costs, six months suspension of
16     license, AODA, Victim Impact Panel and whatever
17     blood draw fee from the hospital that was
18     involved.  I'm not going to say anything more
19     about that.  That is the what the Court has to
20     sentence on that.
21          THE COURT:  Mr. Giesen, can we take these
22     a little bit out of order?  Is there a dispute
23     about what the penalty should be on that case?
24          ATTORNEY GIESEN:  No, there is not,
25     Your Honor.
```

—39—

THE CLERK:  I have to have a blood draw

fee.

        ATTORNEY KLOMBERG:  I have to look back

and see what hospital he was taken to.  I can

get that.

        THE COURT:  Did we miss any components

for that?

        ATTORNEY KLOMBERG:  No.

        THE COURT:  We do not want any

ambiguities in the record.

        Okay.  Mr. Klomberg, you have the floor.

        ATTORNEY KLOMBERG:  Well, Judge, I

learned a lot of things in prosecuting this case

about the facts as I looked through it.

        And I guess we can start with information

that maybe the Court only learned in preparation

for sentencing.  The firearm involved here was

purchased illegally on the street.

        And the Defendant did that apparently

after he had a drug deal that went bad.  He had

a gun held to his head and somebody shot at him.

        He also references this burglary to his

home, but the gun wasn't in the home to protect

the home.  He bought this gun because of the

drug deal that went bad and the burglary was an

afterthought to throw in here and make it sound
a little bit better.

This was an illegally purchased firearm
by a 17-year-old who is not even allowed to
purchase a handgun locally in a store.  And he
bought it on the street for a few hundred
dollars.

I think we start there.  And then that
day he took that gun loaded and decided he
needed to carry that in his car.  He was going
to the range to go shooting, so I can understand
that, perhaps, he wants the gun to go shooting,
but he is a 17-year-old individual.  He can't
have a concealed carry permit.  You go to the
range and you transport firearms that aren't
properly licensed to carry a weapon, they go in
the trunk, they are cased, they are unloaded.

That's not what we have here.  We have an
individual who is rolling around, I posit as a
matter of course in his life, armed at 17 years
old because he was involved in a drug deal that
went bad.  Amoral, illegal conduct.  That's
where we start.

So then the Defendant went to Fleet Farm
high on drugs and decided to steal ammunition,

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 41 of 117   Document 6-14

which ammunition I don't think you can even
purchase there. Handgun ammunition most
retailers won't sell it to people under the age
of 21. So he couldn't get it out unless he
stole it. He stole that ammunition.

And he gets caught. He is contacted by
three individuals. Mr. Berger is off duty. He
is actually there shopping for himself and
notices that the shoplifting is going on.

Ms. Kunkel is a loss-prevention agent.
She also is aware that this is going on. And in
my view of this, they kind of came to the
understanding that the shoplifting was occurring
independently of each other, but then there was
some communication between them.

And Ms. Kunkel follows the Defendant out
into the parking lot and Mr. Kruse, the manager,
goes out, as well. And eventually Mr. Berger
comes out to see if he can assist in the
situation.

And all they are doing is trying to
convince him that he needs to stay. Ms. Kunkel
was in between him and the direction that he was
traveling and Mr. Kruse told her to get out of
his way. This isn't our policy. We don't hold

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 42 of 117   Document 6-14

people.  She never puts her hands on him.

The most aggressive thing she did was stand between him and his car and he was walking out and then they just followed him.  They followed him and he gets in his car and he locks himself in his car.  But on the way walking there, Mr. Kruse has now entered the incident. And he says to Mr. Kruse, stop following me, that's how people get their ass beat.  Quote, that's how people get their ass beat, unquote. So he is threatening already right then and there.

Frankly, there is a crime committed beyond the retail theft of witness intimidation. Andrew informed him that they were going to get his plate and report him to the police.  That's all.  Go to your car, we are just going to get your license plate.  Stay here and wait for the police to come, we caught you.

We're talking about $38 worth of ammo.  A $38 item.  Retail theft, no criminal record, it's an ordinance.  It's an ordinance.

He gets in the car, he locks his doors. They are trying to convince him not to leave. You will see in a moment when I play the video

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 43 of 117   Document 6-14

they all back away.

I know Your Honor is familiar with Fleet Farm in Beaver Dam. There is that main entrance pathway for cars that come in off the main street there, Spring Street. And as you go towards the parking lot towards the building, there is a large sidewalk curb that divides that main thoroughfare from the various parking stalls that are outside. People walk along that curb. You park perpendicular to that main thoroughfare on the other side of that curb.

And that's where the Defendant is parked, on the north side of that main thoroughfare. And the three individuals back up and they get up on that curb. They are not even in the parking lot at that point. They are up on the curb. They are not in a parking stall area.

And Andrew calls 911. As the Defendant backs his car out of the parking stall, he draws his gun, he points it at Bryce and like Bryce said, the window was up. Did he shoot him out of the driver's side window? I think Bryce's inference as to why he didn't pull the trigger at that point is probably a good one.

And he backs up the car, and you will see

—44—

this on the video.  And at this point Andrew is
on with 911 and he stops the car and shoots out
the passenger window and hits Andrew in the
wrist.  It goes through his wrist into his
shoulder.  The bullet lodges.

THE COURT:  Shoots out the passenger side
window?

ATTORNEY KLOMBERG:  The passenger side
window.

And then drives away at a high rate of
speed.  And I want to show the Court that.  Can
I please have the video?

I will need the screen, Judge.  Yes, sir.
For the record, what I am going to play for the
Court is Exhibit 1.

THE COURT:  Any objection to Exhibit 1,
Counsel?

ATTORNEY GIESEN:  No, Your Honor.

THE COURT:  One received.

(Whereupon, Exhibit Number
1 was received into
evidence as of July 21, 2017.)

ATTORNEY KLOMBERG:  So what we are seeing
here and the time stamp is pretty accurate.  And
so at 5:24 and 41 seconds p.m.  And what you are

1    looking at is south to north across the Fleet
2    Farm parking lot.

3          To the right of the screen you can see
4    the white box portion of the building.  That's
5    where the main entrance is.

6          And as I play this forward -- I am just
7    going to play it forward here.

8          And some people have emerged from the
9    front.  Right here where my cursor is pointed is
10   the Defendant and Ms. Kunkel.  Ms. Kunkel is at
11   this point, I believe, behind him.  And we'll
12   watch as we go forward.

13         The person that just emerged in the white
14   shirt, that should be Mr. Kruse.  It's very
15   difficult to see because of the resolution, but
16   as videos go, theirs is a pretty good video
17   system.

18         You can see here at this 5:25:22
19   Ms. Kunkel and Mr. Kruse are between the
20   Defendant and the building on the opposite side
21   of his vehicle from him and they appear to all
22   be just kind of there standing talking.  And
23   there is clear separation between all of their
24   persons.  What you can see here is another
25   person that has emerged from the store is

walking in the direction that they are.  That's
Bryce.

And just to recap here, we are at
5:26:46.  Over the last period that I played,
you actually could see at one point they all
start to walk back towards the Fleet Farm
building and then the Defendant turns and starts
walking back towards his car.  They are over in
this area where I am pointing and that's where
the Defendant's car is located and Bryce is
approaching their location.

I will pause it right there at 5:27:22.
You can see that three individuals have now --
they are up on the curb.  And move this forward
and that car that just emerged was the
Defendant's car.

I'm going to back this up.  Backing up to
5:27:21, I am going to play this forward by
steps.  There is the Defendant's car that just
emerges from behind the other vehicle that's
parked there.

At this point the shooting has actually
already occurred.  And you can see Andrew start
to fall at that point.  I can back it up here at
5:27:21.

1       THE COURT: Go back a little bit. I want

2 to see the car in a parked position if it's

3 visible.

4       ATTORNEY KLOMBERG: It's not from this

5 angle. I will show the Court another angle in a

6 moment.

7       So I will step this forward just to the

8 point where the car begins to emerge at 5:27:22

9 behind the other object. And if you will watch

10 the person in the trio in the middle, that's

11 Andrew. And you can see the moment that he

12 begins to drop. And there he goes down at

13 5:27:24. And the Defendant is driving away.

14       Now I'm going to switch angles here. And

15 before I do that, I'm going to play this

16 forward. You can see the Defendant's car comes

17 out. He is obscured by the building and then

18 there he goes out the parking lot at a high rate

19 of speed toward Spring Street behind the gas

20 station portion of the business.

21       Now I'm going to switch to the other

22 angle in the parking lot. Okay. Now this is

23 the opposite end of the building north looking

24 south. And I am going to back it up --

25 actually, I have to go forward because we

—48—

1     recessed the video when we changed angles.

2     Okay.

3          And I have started it again here at about

4     5:26:13 and right in this area here you can see

5     the individuals talking and this is where they

6     actually start to go back towards the building.

7     And then the Defendant decides that he's going

8     to go for his car.  You can see Bryce come

9     around, the three victims move up onto the curb.

10          At this point, they are out of sight, but

11    this vehicle right here is the Defendant's

12    vehicle.  And I'm starting again at 5:27:15.  He

13    starts to back out, stops and drives.  What you

14    can see at this point is he has pointed the gun

15    at Bryce and we step this forward, he backs out

16    and he has a clear path.  Nobody is blocking his

17    way.  You saw the car drive out of the parking

18    lot.  He is in a vehicle, they are on foot.

19    Nobody has threatened him with a weapon.  He is

20    just free going.  The only thing that's going on

21    is Andrew is calling 911.  He told him he was

22    going to do that.  And at this point he is shot.

23          THE COURT:  Do you need the screen in the

24    next few minutes?

25          ATTORNEY GIESEN:  No.

—49—

1          ATTORNEY KLOMBERG:  So the video clearly

2     shows he is not threatened.  They are just

3     walking with him and at one point he actually

4     starts to walk back towards the building with

5     them, but decides he doesn't want to face the

6     music for stealing the $38 worth of ammo.

7          And he is in a vehicle.  It shows that

8     the vehicle is already pointed out of the stall

9     and ready to drive away and he stops and shoots

10    Andrew who is on the phone with police.  I think

11    that's important.  The guy who is calling the

12    police is the one that gets shot.  The guy who

13    said you are going to get your ass beat is the

14    one that gets shot.

15         I saw on one of these documents the

16    Defendant's mother speculated that the gun went

17    off accidentally.  That's absurd.  This was

18    intentional.  This was intended.

19         THE COURT:  For purposes of making sure

20    we have the facts straight, my notes indicate it

21    was a revolver.

22         ATTORNEY KLOMBERG:  Yes.

23         THE COURT:  Agreed, Mr. Giesen?

24         ATTORNEY GIESEN:  Yes.

25         THE COURT:  A 357.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 50 of 117   Document 6-14

```
 1            ATTORNEY KLOMBERG:  I believe a 38.

 2            THE COURT:  A 38-caliber, either way.

 3       Okay.  Go ahead.

 4            ATTORNEY KLOMBERG:  Can I have that audio

 5       now, Judge?  I want to play the 911.

 6            Do we have external speakers on that?

 7            THE COURT:  Now you've got me.  I don't

 8       know.

 9            ATTORNEY KLOMBERG:  There is an audio

10       output that is set up here, Judge.  It will be

11       better quality, better.  I can play it on my

12       computer and just plug in this output, but I

13       don't know.

14            THE COURT:  Well, as soon as I fix my

15       mistake here, we'll get back to that screen.  On

16       his system.

17            It takes time to warm up, so we can't do

18       anything while it's warming up.  And if I shut

19       it down, it takes time to shut down, so we have

20       to wait.  So it is what it is.

21            ATTORNEY KLOMBERG:  While we are waiting,

22       this is Exhibit 2 and I would move for receiving

23       it for purposes of sentencing.

24            THE COURT:  Any objections to receiving

25       Exhibit 2?
```

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 51 of 117   Document 6-14

```
 1              ATTORNEY GIESEN:  No, Your Honor.

 2              THE COURT:  Exhibit 1 and 2 received.

 3                        (Whereupon, Exhibit Number 2

 4                        was received into evidence as

 5                        of July 21, 2017.)

 6              THE COURT:  Try it now.

 7                              (Audio playing.)

 8              ATTORNEY KLOMBERG:  I'm going to stop it

 9      at two minutes.  I'm going to go back to the

10      first few seconds of the recording, that's all

11      I'm going to replay a couple of times here.  You

12      can hear the 911 call pick up.

13              Nine seconds into the call, you can hear

14      the gun shot.  And just so that -- I'm stopping

15      it there.

16              I won't need any more audio or video,

17      Judge.

18              THE COURT:  Mr. Giesen, if you need it,

19      we'll turn it back on.

20              ATTORNEY GIESEN:  Thank you.

21              ATTORNEY KLOMBERG:  So I think the 911 is

22      very telling.  Andrew is shot through the wrist

23      while he is holding the phone to his ear and the

24      bullet goes through his arm and enters his

25      shoulder inches from his head and chest.
```

—52—

1          This was no accident.  This was a

2     retaliatory act.  Serious physical injuries

3     result, well described in the report.  And there

4     is a long, long treatment.  Significant physical

5     pain.

6          And then there is the PTSD that Andrew

7     describes.  He is going to live with that for

8     his life.  His kids and wife are traumatized.

9     The family is just never going to be the same

10     over $38.98 in ammunition.

11          And the 911 call, I think, is the most

12     critical piece of evidence in the entire case

13     because what it shows, especially for purposes

14     here today, Judge, because what it shows is that

15     the Defendant made good on his promise, on his

16     threat.  He didn't shoot Bryce.  He didn't shoot

17     Kendra.  He shot the manager who said we're

18     going to call 911 and report you to the police.

19          And he did so while he was doing that.

20     He shot the guy who was on the phone calling

21     911.  That was no accident.  That was

22     intentional.  That's who he was aiming for.

23          What was an accident is that he didn't

24     kill him over $38 in ammunition, an ordinance

25     retail theft.

1          This is a highly aggravated crime.  There
2     is significant injury, significant lasting
3     effect.  There is a use of a firearm.  It's
4     retaliation and to trying to avoid apprehension
5     for a different crime.  Witness intimidation is
6     involved.  Several read-ins here that the Court
7     has dismissed and read in, all serious felonies.
8     He is under the influence of drugs at the time.
9     He brought the firearm to the event and had it
10    at the ready.  It's an illegal possession of the
11    firearm.  He is 17 years old.  He doesn't have a
12    concealed carry permit, he is illegally
13    transporting and he purchased it illegally and
14    he is stealing ammunition for the firearm.
15         When you compare this attempted homicide
16    charge to other attempted homicide charges and
17    you look at those factors, this is a maximally
18    aggravated event for all those reasons.  You
19    can't get more aggravated on an attempted
20    homicide charge.  The next step is homicide.
21         And in this case when compared to other
22    attempted homicides, for all those factors
23    covering up the crime, use of the firearm, the
24    outcome, this is a maximum aggravation level
25    offense.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 54 of 117   Document 6-14

1          So now we have to turn to his character.
2     There is no criminal record.  There is minor
3     ordinance violations that he talks about in one
4     of the reports.  There is nothing significant,
5     but -- and I look at the Defendant's Presentence
6     and we have a history of aggression and violent
7     behavior throughout his childhood.

8          And it has to be throughout his childhood
9     because that's all we have.  He is only 17 years
10    old, but what we have is documentation in the
11    Defense's own documents of a long history of
12    physical aggression and violence.

13         He typically acted out the perceived
14    threat in threatening talk of violent behavior
15    or by attacking others physically.  He started
16    having behavioral problems, which included being
17    verbally and physically aggressive with peers
18    and teachers.

19         He was physically aggressive with his
20    mother and other adults when a limit was set.
21    He continued to have problems with poor social
22    skills and defined an aggressive behavior.  And
23    those are all different points.

24         Defendant wants to claim mental illness.
25    It's not an excuse.  It's not an excuse.  Mental

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 55 of 117   Document 6-14

illness does not cause people to commit crimes.
There are the majority of mentally ill people
who suffer with mental illness, serious mental
illness and they don't get criminal problems.
The worse behavior is some sort of disorderly
conduct because of manifestation of their
symptoms.  Criminal conduct is not the result of
mental illness.  It's not.

Most people who suffer from mental
illness do not find themselves in a criminal
Court, certainly not for attempted homicide.
And we are not even sure about the level of his
mental illness.

He goes to Mendota.  And let's remember
Dr. Chapman's report, she had to surreptitiously
observe him for an extended period of time to
detect his highly sophisticated and effective
malingering.  Remember, we had a big Hearing
about that in this case, Judge.

Her diagnosis, Antisocial Personality
Disorder and malingering.  Neither excuse
anything.  Antisocial, not treatable.  That's
being criminal.  And malingering, well, that's
faking mental illness to try to get something
out of criminal liability in this case.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 56 of 117   Document 6-14

1    We have seen this before.  This Court has
2    experienced criminals who have lifetime exposure
3    to mental health treatments, numerous
4    inconsistent diagnoses, they learn to be very
5    good at malingering.  Because, one, the two ways
6    you can get really good at faking mental illness
7    is you be in places, facilities or experiences
8    where you can observe somebody who is truly
9    mentally ill and learn how to mimic behavior.
10    And, two, get feedback from clinicians who are
11    trying to treat you and they evaluate your
12    presentation and they tell you I believe you are
13    mentally ill or they don't and you modify your
14    presentation.  We've seen this before.
15    And when we look at Dr. Chapin's report,
16    the Defendant was engaged in highly
17    sophisticated deception to make it look like he
18    was mentally ill.  And she detected only through
19    lengthy observations when he wasn't aware he was
20    being observed.
21    This is a highly sophisticated, violent
22    and dangerous individual.  He didn't just,
23    quote, react.  He brought the gun.  He kept it
24    at the ready, loaded.  And then he retaliated
25    against the person who not only he warned would

get his, quote, ass beat, but he did so while
the person was actually calling 911.

And then he claims not to remember what
happened.  How convenient.  More manipulation.
Reaction?  Yes.  Reaction to being caught and
reported.

This is an individual who has a history
as shown solves his problems with violence.  He
combines that with the
substance -- you combine that with the substance
abuse issue, the sophistication, manipulating
the system and we have a person that's very
dangerous to the public.

Now, there is no criminal record.  He was
17.  You can't get a criminal record before you
are 17.  This is a person who will do this again
if he is left unchecked.  Maybe not this same
thing, but he will victimize someone in the
future and do so violently.  Because that's how
he deals with his problems.  That's how he
reacts to situations.

Remember, the fact that he brought the
gun to the situation should not be lost on the
Court.  If he knows that he has this problem
with anxiety and reacts violently, now he adds a

1   gun to the mix.  And he used it.  If that's even
2   true.

3        This man has a dangerous and violent
4   character.  This man has a dangerous, violent
5   character.  He is not a boy, he is not a child.
6   He is an adult.  His anxiety, his pain, his
7   challenges, we have spent a lot of time
8   discussing how difficult this has been for the
9   Defendant.

10       Let's not lose sight of the fact that the
11  victims, also because of him, had to deal with
12  pain, anxiety and challenges that he alone
13  inflicted on them for nothing more than doing
14  their jobs.  A loss prevention agent and a
15  manager trying to prevent retail theft and an
16  off-duty police officer trying to do what his
17  career is, to stop crime.  Just for doing their
18  jobs over $38 in ammunition.

19       The public needs protection.  Long
20  incarceration is warranted to protect the
21  public.  This is a very violent individual with
22  a history of solving problems with aggression
23  and violence.

24       The Presentence Investigation recommends
25  three to four years initial confinement with

738 days of credit.  Under that sentence, he will be out in less than a year or just short of two years, well before he is 21.

The Defendant in the Presentence Investigation done by the Department opines that five to seven years prison is appropriate.  That would have him out before he is 24 on the higher end.  The Department of Corrections Presentence is 13 to 16 years Initial Confinement with seven to ten years Extended Supervision.  That would be put him in his late 20s early 30s with supervision to around age 40.

And one thing that I think needs to be made note of is this discussion about how he has done so much better since he has been incarcerated.  He does well in a confined setting.  Mr. Berger points that out that that's probably the best place to get his medication monitored.  I agree.

And what's more, is when he goes to jail, he didn't do well at first.  He was disruptive, he flooded his cell, apparently I heard something about contraband, but none of that -- none of that is explained away by saying well, he is doing better now because of his medication

change alone.

He has adjusted to institutional confinement. And he has done well. He has good institutional adjustment. He does well in a confined setting. And the public is protected from him. I believe the Initial Confinement period should be 15 years. With credit, that will let him out when he is 32. But I also believe that the Defendant needs to be on supervision for as long as we can manage. And the 20 years of Extended Supervision is the maximum that the Court can impose for that period. And I think that's what it should be. That would keep him on supervision until after his 50th birthday.

And we talk about brain development, getting him out when he is 32, the brain will be developed by then. I don't really put a whole lot of stock in this case who is a violent individual who is going to re-offend. And he is going to re-offend even under the sentence that I am recommending.

After reading all the material, studying the case, I am convinced he is going to offend violently. And not to impose this type of

sentence would not be doing everything we can to
protect the public.

I don't relish the idea of sending a
teenager to prison for 15 years, but this is one
of those cases that just stands out and an
individual who stands out.

This is the kind of senseless extremely
dangerous situation that we used to believe was
a big city problem. Jared Spencer brought this
violence to Beaver Dam. His actions, in fact,
did not only affect Mr. Kruse, Ms. Kunkel,
Mr. Berger, but has shaken the very core of our
small time town values.

He needs to go to prison to protect the
public for a long time. I think he is going to
re-offend and I encourage the Court to impose
that sentence.

Thank you, Your Honor.

THE COURT: Mr. Giesen, would you like to
commence your presentation when we reconvene?
I'm thinking 1 o'clock.

ATTORNEY GIESEN: If it would take us
that long to get lunch, we can come back at
quarter to or whatever.

THE COURT: I realize that you are going

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 62 of 117   Document 6-14

```
 1      to want to respond.  So you may want some time
 2      to talk to your client and plan your strategy
 3      and these people want to be able to get
 4      downtown, get ordered, get served and get back
 5      here.  Are we rolling the dice time-wise if we
 6      come back at 1:00?
 7              ATTORNEY GIESEN:  We can accomplish that.
 8              THE COURT:  I don't want to be cutting it
 9      short at the end.  If you think we are really
10      cramped, we can come back at quarter to 1:00.
11              ATTORNEY KLOMBERG:  Unless Mr. Giesen's
12      presentation is going to be three hours in
13      length, I don't think we are going to be cramped
14      for time.
15              THE COURT:  Let's do 1:00.  We can get
16      lunch served without having to rush.  You will
17      have time to prepare your -- fine tune or modify
18      your comments based on Mr. Klomberg's
19      presentation and that should hopefully leave me
20      some time to make my record.
21              ATTORNEY GIESEN:  Thank you.
22              THE COURT:  Recess and reconvene at 1:00.
23                          (Whereupon, a short recess
24                          was taken.)
25              THE COURT:  We'll recall 15-CF-256.  The
```

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 63 of 117   Document 6-14

```
 1      appearances are the same as previously stated.

 2              I believe Mr. Klomberg concluded his

 3      remarks.  Am I correct, Mr. Klomberg?

 4              ATTORNEY KLOMBERG:  I did, Your Honor.

 5              THE COURT:  Exhibits 1 and 2 have been

 6      offered and received.  I have been informed that

 7      the immediate victims to this offense are here

 8      and the other person did not intend to come

 9      back.

10              So Attorney Giesen, you have the floor.

11              ATTORNEY GIESEN:  Thank you, Your Honor.

12      Ramona Doctor would like to address the Court

13      with respect to her grandson, Jared.

14              THE COURT:  Please come up to the witness

15      stand and when you are by the flag, raise your

16      right hand.

17                                    (Witness sworn.)

18                      RAMONA DOCTOR,

19      called as a witness herein, having been first

20      duly sworn, was examined and testified as

21      follows:

22                        EXAMINATION

23  BY THE COURT:

24      Q.   Please have a seat.  Please feel free to

25      adjust the microphone as needed.  Make sure that
```

it's close enough.  Take a deep breath and relax
and start by giving us your name?

A.  My name is Ramona Doctor.  And I'm from
Madison.  And Jared is our grandson.  We used to
take care of Jared when he was smaller.  And I
know how old he was and then he finally was old
enough to kind -- so Jared is not a monster.
Jared is a good, kind person when he's not
involved in something that he should not be.  He
was not taught that way because we raised four
children.  And none of those have got anything
that they land behind doors, bars I should say.
But that's not the case.

        And what he did, we feel very sorry for
the people that this happened.  And it isn't
just that.  I'm saying it today, but we have
thought about that a lot.  And we're sorry.  And
so I thought it would be nice to talk about
Jared, something nice about him.  Because he was
more or less our child because we took care of
him so much.

        And whenever we picked him up from school
or something they all said bye Jared, bye Jared,
we'll see you tomorrow.  And he was always very
concerned about children in wheelchairs and he

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 65 of 117   Document 6-14

```
 1    talked to them or took them to places, you know,

 2    wherever they wanted -- excuse me -- wanted to

 3    go.  And then he was very thoughtful with older

 4    people.  He was -- he took care of them.

 5         I know.  I had a back surgery and he took

 6    care of me and he took care of his grandfather,

 7    too, which he lost now.  He didn't even get to

 8    see grandpa in his last moments anymore.

 9         So I just want to say that he's not a

10    monster.  That he's a good child, but things do

11    happen.  And we preached and preached on things

12    that we thought were wrong and he finally said

13    to me one day, grandma, they shot people again

14    on television.  I said Jared, they don't kill

15    those people.  If they would kill those people,

16    there would be nobody to make those movies.

17         And then I heard him say they don't kill

18    those people, they just pretend.  Which I felt

19    very good.  Because I was the one that taught

20    him that.

21         So I mean, as I said, we're very sorry

22    for what happened to the family that, you know,

23    I don't know much about it or anything about it,

24    but he is not a monster.  He is a good boy when

25    he is not in the wrong bunch.  And I think
```

1     that's probably what happened.  He got into the
2     wrong bunch.  As everybody does.  So to get
3     involved in those things and then when it's
4     done, it's done.
5         So that's about all I have to say.  I was just
6     going to say something decent about Jared.  And
7     you'll have to excuse me.  I am an asthmatic.
8     That's why my voice sounds like this, especially
9     if I talk a lot.  So we are sorry what happened,
10    but it happened.
11             THE COURT:  Thank you.
12             Mr. Geisen?
13             ATTORNEY GIESEN:  I have nothing further.
14             THE COURT:  Attorney Klomberg?
15             ATTORNEY KLOMBERG:  No, thank you.
16             THE COURT:  Thank you, very much, ma'am.
17    You may step down.
18                             (Witness excused.)
19             THE COURT:  Okay.  Attorney Giesen, you
20    may proceed.
21             ATTORNEY GIESEN:  Thank you.
22             Your Honor, this is obviously a sad and
23    solemn day.  It has had a serious impact on the
24    lives of all the families, all the persons
25    peripherally involved.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 67 of 117   Document 6-14

1          But I would like to emphasize to this

2     Court, that in spite of all the terrible things

3     Mr. Klomberg has said about Jared Spencer, you

4     have standing before you today for sentencing a

5     teenager.

6          At the time this incident occurred he was

7     a mere junior in high school.  And we haven't

8     talked much today about the Law which the Court

9     is obligated to and we are confident will

10    follow, but the Law recognized, as I pointed out

11    in correspondence to the Court -- and this is

12    the United States Supreme Court, quote, children

13    are constitutionally different from adults for

14    purposes of sentencing.  Because juveniles have

15    diminished culpability and greater prospects for

16    reform.  We explain they are less deserving of

17    the most severe punishments.

18         The Supreme Court in reaching that

19    conclusion studied and cited to a great deal of

20    empirical evidence that led them to conclude

21    that youth's brains develop differently.

22         We provided the Court with a great deal

23    of scientific research in that area.  And

24    consequently, they lack maturity and have an

25    underdeveloped sense of responsibility.  And

1    that, in turn, leads to recklessness,
2    impulsivity, poor decisions and heedless risk
3    taking.
4          Those words of the Supreme Court describe
5    Jared Spencer perfectly.
6          Turning to the offense, certainly those
7    are attributes are no excuse for what Jared did
8    that day.  It was an awful crime, it really was.
9    And it did have an impact on the victims
10   exceptionally so.
11         However, I'd like to briefly touch on a
12   few of the things Mr. Klomberg pointed out that
13   we feel are mischaracterizations or else not
14   supported by the evidence.
15         For example, I believe he indicated
16   certainly Jared's conduct indicated he wasn't
17   using any judgment at all, let alone his best
18   judgment.  But if you look at the incident
19   itself and you could see it on the video, parts
20   of this Jared was in the store, he did shoplift.
21   As he left, you could see in the video he was
22   surrounded by three people and given his anxiety
23   and mental health history, that probably had a
24   disproportionate affect on him.
25         One thing that wasn't clear from the

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 69 of 117   Document 6-14

video was Mr. Berger pounding on the window of
his car.  And, again, certainly Fleet Farm is in
no way to blame for this, but I just read
yesterday ironically about, I believe it was
Wal-Mart, has a policy that they don't pursue
shoplifters out into the parking lot and risk
physical confrontations because it's not worth
$38 to anyone.

But Mr. Klomberg implied, as I understood
his argument, that Jared who had a two-inch snub
nose revolver was attempting to shoot the
telephone out of a person's hand.  Well, that's
first off, a preposterous, remarkable feat of
marksmanship.  He had only gotten that gun a
week or two before, had never fired it before.

And the truth, the fact of the matter is
he wasn't firing at any one in particular.  It
is a tragedy that Mr. Kruse was struck, but that
was certainly not Jared's intention.  Had he
intended to harm those people, obviously there
would have been more than one shot other than
the impetuous single shot he fired as he was
fleeing.

Mr. Klomberg also might have implied that
Jared has some sort of juvenile history.  That's

1     absolutely not true.  He has no criminal
2     history.  He is standing before this Court as a
3     first offender.  He has never been in Juvenile
4     Court.  And he has never physically attacked
5     anyone.  He doesn't have any history of
6     violence.
7          Mr. Klomberg also alluded to Ms. Chapin's
8     report that mentioned for the first time in
9     14 years of psychiatric care anyone ever
10    mentioned malingering.  Ms. Chapin was one of
11    the psychologists at Mendota who called me to
12    speak to me about Jared.  And she talked to me
13    one or two minutes and concluded her remarks by
14    saying I am going to find him competent.
15         Well, okay, she did.  He is back before
16    Court and thankfully he benefited from the
17    treatment at Mendota Mental Health, but to say
18    that he does not suffer from a mental illness is
19    just outrageous.
20         The Court has reviewed -- the Court
21    appointed psychiatrists, Dr. Schoenecker and
22    Dr. Lee, both of whom are psychiatrists,
23    diagnosed Jared with serious mental illnesses
24    throughout the course of his treatment.  He has
25    been diagnosed with Bi-Polar Disorder, other

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 71 of 117   Document 6-14

disorders.

To deny that he has serious mental health problems is just ignoring reality. And Your Honor might very well remember we came before this Court, he was having difficulty in confinement in the Dodge County Jail because he wasn't getting proper medications. And Your Honor Ordered -- stated that the Court would impose Orders if necessary to be certain that he gets his appropriate medications at the appropriate times.

He did while he was at Mendota. He has been able to continue on that fairly well with remarkable, commendable results.

Getting back to the Law. The issues before the Court today, which one of which has not been addressed at all that the Court has to consider, is our Supreme Court has annunciated in McClary and Gallen, more or less a presumption in favor of Probation. What the Court said is the Court should impose the minimum amount of confinement consistent with protection of the public, the gravity of the offense and the rehabilitative needs of the Defendant.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 72 of 117   Document 6-14

We would submit that the Presentence
Report submitted to the Court by the Department
of Corrections, at least its recommendations
should be disregarded by the Court because that
Presentence Report did not address the issues
that Your Honor has to.

          Specifically, the author of that
Presentence Report never read any psychiatric
history, any medical records.  They said they
hadn't received them yet.  So that author simply
pulled numbers out of thin air without
addressing or considering the rehabilitative
needs of the Defendant.  And as the Law requires
and as we trust, this Court will.

          With respect to the gravity of the
offense, this is a serious offense.  No doubt
about it.  Mr. Kruse suffered serious injuries,
but what the Court has to bear in mind is this
was not a premeditated act.  This was an
impulsive, reactive, but stupid act on the part
of Jared.

          The police reports and Mr. Berger
indicate that when he approached Jared, he was
shaking, he appeared panicked and reacted out of
panic.  It was a stupid, juvenile, impulsive act

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 73 of 117   Document 6-14

1       on his part.

2               We submit that Jared -- he has never been

3       to jail before in his life.  We submit that he

4       has been punished commensurate with the gravity

5       of the offense already by having served more

6       than two years mostly in the Dodge County Jail.

7               We'd also point out, as the Court can

8       see, Jared is a slightly built teenager who

9       would doubtless be prayed upon, victimized,

10      abused and in all likely emotionally destroyed

11      if he were to be placed in a State Prison.  He

12      is not the sort of person who has the character

13      or physical stature to protect himself in those

14      circumstances.

15              The State spoke about the need for

16      protection of the public.  We submit, Your

17      Honor, if you look at Jared's entire history

18      since he was a young child, there is no record

19      of him ever attacking or engaging in violent

20      behavior with members of the public.  He has

21      never been a threat or menace to the community

22      or to others.  He has no history of violence or

23      fighting.

24              So the needs for protection of the public

25      are not compelling or overwhelming in this case.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 74 of 117   Document 6-14

1     I'm sure the Court has seen many people that
2     have multiple batteries, disorderly conduct,
3     repeatedly engaged in violent or disruptive
4     behavior.  That's not Jared.  He is a first-time
5     offender before the Court.  He is, as the
6     background information indicates, immature,
7     which substantiates the lack of a neurological
8     development that the U.S. Supreme Court referred
9     to.  He was socially awkward.
10          He seems with the two years that have
11    passed to have gained some insight, perspective
12    in maturity.  As I indicated, and the science
13    indicates, the juvenile brain of 17-year-olds is
14    just not the same as that of an adult
15    particularly with respect to risk taking and his
16    ability to make good choices.
17          We also submitted to the Court, again, we
18    believe it's beyond debate that he has
19    substantial mental health needs.  So the
20    question the Court has to address is how can
21    those best be met.
22          And as I pointed out to the Court in our
23    submission, the Wisconsin State Prisons are
24    woefully understaffed with respect to the
25    ability to provide mental health or psychiatric

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 75 of 117   Document 6-14

care with the Wisconsin Resource Center being
the sole exception.  They have less than half
the staff that the American Psychiatric
Association recommends at a minimum.

So the question is people can say oh,
sure he'll get treatment there if he is sent to
prison, but the reality is otherwise.  There
simply are not the resources to treat all of the
inmates who are suffering from serious mental
illness.

Jared's father and mother have been
extremely supportive.  They are here every week
to see him at a minimum.  They have implored me
to contact the jail to be certain that Jared is
getting the appropriate medications.  They love
their son.  They are extremely concerned about
his immediate well-being and his long-term
well-being.

And we submit that that would best be met
if he were under their strict supervision.  And,
of course, with the Department of Corrections
adding the stringent conditions.  That is one
thing that the State's Presentence Report does
properly address; that he maintain absolute
sobriety, that he have assessments, attend all

groups, counseling, treatment as recommended,
that he maintain full-time employment or
schooling and that he comply with all of his
medications.

There are ways to monitor that. Periodic
testing, for one. And obviously, that he have
no contact with Mr. Kruse, Berger or Fleet Farm.

One other thing that's very unusual about
this case is the very strong family support that
Jared has the benefit of. And that's just not
to Jared's benefit, that's to all of our
benefit, to the entire community.

As I said, his father and mother haven't
missed a Court appearance. His grandmother is
here, his siblings are here. His sister. They
are behind him and will do everything to help
and provide him with the guidance and support he
needs. I am certain, of course, people come in
and stand in front of you in an empty Courtroom.
People who aren't fortunate to have that strong
support.

Judge, it's apparent that this has been a
tragedy for at least two families. And
everybody here wishes that July day could be
revisited, but it can't. So what the Court has

to address today is what is the appropriate way
to resolve this.

Jared has spent two years in confinement
already. As I indicated, that's a pretty
serious punishment for somebody who has never
ever been locked up before, who has never
committed a crime.

We would suggest that the Court impose
and stay a sentence and place Mr. Spencer on
Extended Supervision or Probationary Supervision
for a lengthy period of time. If the problems
that the State imagines ever manifest
themselves, then the answer would be clear and
Jared would be removed from society.

If the Court feels that some additional
incarceration is necessary, and we would
respectfully submit it is not, we would suggest
a sentence of three or four years Initial
Confinement. And the reason we make that
suggestion is at that point Jared would be
22 years old. He hopefully would have completed
his high schooling while in the institution, but
importantly his brain would be mature. That's
the age that psychiatrists, psychologists,
neurologists recognize a person generally does

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 78 of 117   Document 6-14

1    reach maturity.

2          Finally, I again wish to extend our

3    deepest sympathy to Mr. Kruse and his family.

4    It was and remains a terrible thing that's going

5    to haunt them forever and it's going to haunt

6    Jared forever, but I was moved by his comment

7    that the Good Lord teaches us to forgive.  And

8    Mr. Kruse wanted his children to hear that and

9    learn that lesson today.  He is forgiven.

10         We ask the Court to take that into

11   account, as well, in imposing his sentence.

12         Thank you.

13         THE COURT:  Mr. Spencer, is there

14   anything that you would like to say before

15   sentence is imposed?

16         DEFENDANT SPENCER:  Yes, Your Honor.

17         THE COURT:  Go ahead.  You have the

18   floor.  Please use the mic.

19         DEFENDANT SPENCER:  On July 15, 2015 I

20   made the worse decision of my life.  After

21   stealing two boxes of ammunition, I was

22   confronted by Andrew Kruse and his co-worker,

23   Kendra Kunkel.  Another man named Bryce Berger

24   tried to help Andrew and Kendra to get me back

25   into the store.

1          I walked to my car and closed the door.

2     I could have just driven away, but I didn't.  I

3     was afraid.  I was panicked.  And I shot Andrew

4     and sped off.  Andrew was just doing his job.

5          I have never handled myself well in

6     stressful situations.  It's something that I

7     have struggled with my entire life.  This

8     horrible situation is the result of a hundred

9     poor decisions while being a teenager.

10          I stopped taking my medication.  I

11    stopped going to school.  I stopped going to

12    church.  I started smoking weed, popping Xanax

13    and Percocet.  In a few years I managed to screw

14    up everything that I could have going for me.

15          Everywhere I look, people are playing

16    with guns and doing drugs.

17          THE COURT:  Say that again.

18          DEFENDANT SPENCER:  Everywhere I looked,

19    people were playing with guns and doing drugs.

20    And that's not how I want to live my life.  A

21    lot of people -- looking at myself now, I wish I

22    could take back the past few years of my life.

23    I wish I had never gone around people who

24    thought guns and drugs were normal.  I wish I

25    could be a kid again.

I made adult decisions that have adult
consequences, but I never learned how to be an
adult.  I wish I could take it all back.  Not
just for me, but for everyone who has been hurt
by my decisions.  I'm not sitting here saying
that I shouldn't be punished for the horrible
mistake I made when I pulled that trigger.

I opened a door to a life I don't want to
live.  All I want to do now is close that door.
My only chance to straighten out my life is
through the mercy of the Courts.  I just pray
that I am left with enough time to create a
meaningful life for myself.

I don't know if I will ever understand
why I did what I did, but I did it.  And I know
it was wrong.  On July 15, 2015, I shot
Andrew Kruse and I'm so, so sorry.

Andrew, I affected your life in one of
the worst ways possible to affect someone's
life.  I wish I could take it back, but I can't.
My apology can never be expressed adequately in
words alone, but I never felt more regret, shame
about my actions than I do now.

I also want to apologize to Kendra and
Bryce.  Nobody should have to go through what

1    they did that day.  I'm truly sorry.  And I hope

2    you can find in your hearts to accept my

3    apology.

4         That's all.

5         THE COURT:  Any reason why sentence

6    should not now be imposed?

7         ATTORNEY GIESEN:  No, Your Honor.

8         THE COURT:  Well, before I forget to say

9    it, that was one of the most well-delivered

10   comments I have ever heard from anybody.

11        And, Mr. Spencer, do I have your

12   permission to read parts of that without

13   disclosing your name to other young people who

14   might be sitting in that chair?

15        DEFENDANT SPENCER:  Of course,

16   Your Honor.

17        THE COURT:  Every one in here has an

18   emotional investment in this case.  God or bad,

19   the facts that are reported in both the

20   Prosecution and the Defendant's Presentence

21   Memorandums basically are in agreement.  I found

22   two statements that didn't quite match up.

23   Whether they are important enough for me to

24   mention here today or not, I don't know.

25        I want to start out by saying that this

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 82 of 117   Document 6-14

crime is not the fault of Mr. Spencer's father,

mother, teachers, treatment professionals, Fleet

Farm employees or anyone else but Jared Spencer.

I've got to believe that his mom and dad

are in a living hell right now probably asking

themselves every day what could we or should we

have done.

The reports indicate that dad did not

believe that the meds were appropriate for Jared

when he was a young child. I was Family Court

Commissioner for 29 years. It's common that

moms and dads don't agree on the meds that the

child should or shouldn't be getting. Most of

them end up growing up perfectly well-adjusted

and never have to sit in that chair. A parent

has a right to make that discretionary decision

as to what treatment their children should

receive.

The reports indicate mom was lenient and

dad was strict. Not uncommon that one or the

other is lenient and one or the other is strict.

Most of the time the kids grow up more or less

perfectly fine.

Mom and dad let Jared choose who he

wanted to live with. I will tell you just as an

editorial comment, that I as Judge and Family
Court Commissioner never allow the child to
decide where he or she wants to live unless in a
rare occasion everybody is well-adjusted and
there is no controversy and no fighting, which
happens once in awhile, but as a general rule
it's a bad idea because you lose your control
over the child.

What's the difference between an adult
and a child.  The parents have control over a
child that they don't have over an adult.  A
parent can even walk into the doctor's office or
the school office and find out what their kids
medical exam was or grades are.

So when you let the child decide where he
is going to live, you just basically cut your
own control in half or worse.  But did that have
anything to do with this?  I don't think it did.
So don't blame yourself for all these difficult
decisions you had to make while this person was
growing up.

With the benefit of hindsight, we can all
say that maybe we should have acted differently.
Maybe the people at Fleet Farm need to revise
their policies.  Nothing that Fleet Farm or the

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 84 of 117   Document 6-14

1    Fleet Farm employees or the off-duty police
2    officer did had any causal effect whatsoever on
3    this crime.  So if you want to reflect on it and
4    do an analysis and decide if maybe you should
5    have done something different, fine, but don't
6    blame yourself for this.
7         The evidence indicates that while Jared
8    was at Mendota Mental Health he was taking his
9    meds on a consistent basis with noticeable
10   improvement.  Everybody has commented to that
11   effect, but with hindsight maybe a Chapter 51.20
12   commitment would have been in the treatment that
13   he should have received.
14        The problem is when I look back at the
15   record, there probably was no particular
16   incident that would have prompted somebody to
17   think of that.  So here we are.
18        The sentencing report of Ms. Schmidt on
19   Page 18 says Jared poses some risk to the
20   public.  This is his Presentence Report because
21   of his mental health issues and past substance
22   abuse.  It is imperative that he continue to
23   receive mental health treatment both in and out
24   of custody.  And I think -- well, I accept all
25   of the mental health comments that have been

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 85 of 117   Document 6-14

1    made and really there is no dispute.  The same
2    records are in both Presentence Reports.

3         The mental health issues do not rise to
4    the level of a defense.  And I am not aware of
5    any authority for the proposition of -- the
6    proposition that Anxiety Disorder or depression,
7    which are the two most consistent common threads
8    in all of his diagnoses, could be expected to be
9    a major contributor to Mr. Spencer's conduct.

10        This young man has had a serious conduct
11   problem since the age of four.  Normally, I
12   would not consider conduct of a person at the
13   age of four to be the least bit significant to
14   any decision I have to make.  And Mr. Spencer is
15   going to be sentenced for what happened on
16   July 15, 2015, not on what he did in grade
17   school and not on what he did in high school,
18   but the significance of this conduct record that
19   goes back to age four is that it shows a
20   consistent pattern of behavior which due to the
21   fact that he was 17 is the only evidence that we
22   have as to what and who is Jared Spencer.

23        Some people say we are what we eat.
24   Well, you could also say we are what we do.  I
25   do not believe it's common for a preschool child

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 86 of 117   Document 6-14

to be expelled from preschool for uncontrollable
behavior.  Now, whether that happened or not, I
don't know, but that's what's in the report.

As I said before, I wouldn't care about
that if it weren't for the fact that that was
the start of the pattern of consistent behavior
problems that have been associated with Jared
Spencer through his entire life.

Third grade 2006 and 7, weekly or monthly
calling teacher's names and not getting along
with other students.  February of '09 suspended
from school for tearing apart the assistant
principal's office.  In 2012, suicide threat,
disorderly conduct in school, refused to do
homework.  In 2015, swore at a teacher something
to the effect -- I don't know if I copied it
entirely correctly, quote, this is fucking
bullshit, you better get Mrs. G here before I
kick your ass.  And then later to someone else
fuck you, bitch.

He lost a job as a result of a
disagreement, which I usually interpret it to be
a euphemism for insubordination.  What happened,
I don't know, but most people who have a
disagreement at work lose their job.  The boss

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 87 of 117   Document 6-14

always wins the argument.

Right before the shooting happened, he told the Fleet Farm people who were doing their job that's how people get their ass beat. Not very pleasant things to have to listen to in Court.

Mr. Giesen, who did a wonderful job of representing this young man and did a wonderful job today, alluded to some of the things that Mr. Klomberg said. Mr. Klomberg didn't make those things up. They are there. They are not going away.

And there isn't a lot -- there is no -- how should I put this? After giving it some thought, I came up with one little tiny silver lining in looking at this whole series of events. Nobody got killed. Other than that, I am not coming up with a flip side or a silver lining because there just isn't any.

Maybe two. He is still a young man. He still has time to make something of himself. And I have heard reports of people who walk out of prison, moved away, started a new life and actually stayed out of trouble for the rest of their lives.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 88 of 117   Document 6-14

So is it possible, Mr. Spencer?  It's
possible.  Is it easy?  No.  But if ever there
was a time when you do dedicate yourself to
helping yourself do better, this would be the
time to start.  You have friends and family who
are willing to support you.

As Mr. Geisen said, very few people
sitting in that chair have anybody in Court with
them.  And you do.

After this incident happened, the other
thing anchoring this chain of conduct that
impresses me, unfortunately not to his benefit,
is that after he had been arrested, he flooded
his cell, threw water, he didn't think it was a
big deal.  And he refused his meds.

And I am finding it very difficult to
reconcile how a 17-year-old arrested for
attempted homicide and in the jail could -- I
mean, I realize 17-year-olds do that stuff all
the time, but one would think when you are in
jail for having shot somebody and you realize
that you quit taking your meds three weeks ago,
that this would be a good time to just do what
you are told for once.

By refusing his meds, he sent a signal to

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 89 of 117   Document 6-14

the staff that he does what he wants when he
wants.  If he doesn't want to take his meds, he
is not going to take his meds.

        And the reason that I am mentioning that
is that ties in with what got us here.  He had a
mom, a dad, school, people, counselors, any
number of counselors working with him.  He could
not or would not take his meds.  And when I am
sitting here trying to decide what do we do with
Jared now, and I find in the report that when he
was in jail after he had been arrested and was
offered and prompted to take his meds, he
refused to take them.

        And now I am being asked to let him go
back home and let his mom and dad, and I am not
criticizing mom and dad at all.  I raised two
kids.  I could never get them to do what I
wanted to do, they did what they wanted.
Fortunately, most of the time it was what I
wanted, but if they didn't want to do it, they
didn't do it.  That's life.  Kids come in here
all the time in trouble and I say I can't make
you do anything.  You are the one driving the
boat.  The thing of it is you push, somebody is
going to push back.  So you can't get somebody

to do what they don't want to do.

Jared Spencer doesn't want to take his
meds.  Never did.  The question is will he ever.
Now we are in a situation where I have to weigh
his ability to stick with the meds against the
public's safety.  And I am being asked to roll
the dice and he has no good track record
whatsoever for me to look back on and say yeah,
he can do this.

If it hadn't been for the incident in
jail, I'd say maybe, but that is a big -- to me
that is a very important fact here.  You can't
do it when the jailer prompts you to do it, it's
not going to happen.

Due to his age and the science of
adolescent brain development, Jared Spencer is
entitled to leniency at sentencing.  Normal
brain development of adolescents makes it more
likely that they will take unreasonable risks
and makes it more difficult for them to exercise
judgment or appreciate the consequences of their
actions.

An argument could be made that Jared's
brain development was adversely affected by the
trauma resulting from the stress of his parents

divorce.  A lot of kids grow up with a nasty
divorce and they don't all end up sitting in
Mr. Spencer's chair.  So I don't know if that
had anything to do with it or not.

The public policy and the Law which says
that Mr. Spencer is entitled to leniency is
supported by science which is generally accepted
in the scientific community, the medical
community, the mental health community and the
legal community.  And it's the Law.  So I'm not
arguing with it or resistant to it one bit.  I
understand it.  And even if I didn't like it,
it's the Law so I have to follow it.

At the same time, for those of you who
don't like it, an eye for an eye and a tooth for
a tooth isn't the Law, either.  The Law is what
it is.  So we have to follow it.

Here are the facts that I think are most
pertinent to my decision.  Mr. Spencer has a
long history of mental health issues.  A long
history of mental health medications and
treatment.  Facts tend to indicate that his
condition improves when he is on the right meds
and when he takes them.  He does not always
consistently take his meds.  He stated that he

stopped taking his meds a few weeks before this
happened.

His mom said she put the meds out,
assumed he was taking them, which implies to me
that it's not just recently that he quit, but
maybe he hasn't been taking them all along, but
that I am not sure about.

Mom reports that his mood was horrible
when he stopped taking his meds. And lastly,
which I already commented, he refused to take
the meds even when prompted to do so in jail.

Mr. Spencer overreacts to tactile
stimulation. He becomes extremely anxious and
distressed when someone comes into close
proximity to him or if he is touched. I am not
sure, there is no evidence that says the extent
to which he has control over this or the extent
to which treatment can help, but this has been
what's reported.

Mr. Spencer, his parents, all of his
treatment providers, the school counselors and
all the people that have worked with him over
the years have not been able to control his
behavior which has resulted in a persistent
pattern of destructive and aggressive behavior,

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 93 of 117   Document 6-14

```
1      absence from school and a conviction for
2      attempted first degree intentional homicide.
3            His conduct has resulted in series bodily
4      injury to the person shot.  The serious
5      long-term result to pain, suffering, disability
6      and psychological damage to them, the families,
7      everybody who saw it and a substantial list that
8      harmed everybody that was in the neighborhood.
9      How many people were within range of that 357 at
10     the time it went off.  You are talking about
11     Fleet Farm in Beaver Dam.  You are not out in
12     the middle of a field.
13           I also find, as suggested by
14     Attorney Giesen, the Wisconsin Prison System
15     does not have adequate resources to treat
16     inmates for the mental health issues.  Maybe if
17     I had had the Director of Mental Health issues
18     here, they might say wait a minute, the American
19     Psychiatric Association recommends high in the
20     sky stuff and what we are doing is more than
21     adequate.  I don't know what they would say, but
22     I'm sure they would like to be heard on that.
23           But I think it's reasonable to believe
24     that he's -- that his level of mental health
25     treatment would maybe not be ideal in the
```

—94—

Wisconsin Prison System. I have heard all kinds
of reports from people that have been there and
say I never got the treatment I thought I was
going to get. Whether it be substance abuse
treatment, mental health treatment or whatever.

So one of the things that I have to
comment on, treatment whether it be substance
abuse treatment or mental health treatment isn't
going to be delivered like a pizza. If you need
it or if you have a loved one that needs it or a
friend that needs it, you have to take the
responsibility of getting it and following
through. It's not somebody else's job to make
sure you get the treatment.

Now, he is a 17-year-old. You don't
expect a 17-year-old to do that and his mom and
dad had, to their credit, put him in as much
treatment as they could, but at this point on
we're getting as much treatment as he can, but
it's not a perfect world. I don't know what
he's going to get.

I conclude from those facts that
Mr. Spencer's inability to control his actions
constitutes a substantial risk to the safety of
himself and the public. By drawing a gun, he

1    could have been shot by the off-duty policeman

2    or someone else who had a concealed carry

3    permit.

4         He caused irreparable harm to a large

5    number of victims and could have harmed or

6    killed more.  There is no reason at this time to

7    believe that any level of supervision will

8    ensure the safety of the public.  Mr. Spencer

9    cannot be trusted to take his meds as

10   prescribed.  And I am not aware of any amount of

11   the supervision outside a custodial setting that

12   would be adequate.  I don't buy the argument.

13   The facts don't support the argument that he can

14   take his meds as prescribed without being in

15   custody.  He doesn't always take them when he is

16   in custody.

17        Now, there are some conflicting

18   interpretations that I want to address.  I

19   specifically reject the assertion that

20   Mr. Spencer overreacted to the actions of

21   someone else or that the gun accidentally went

22   off or that he did not intend to harm someone.

23        Now, I can't read his mind, but a Jury is

24   instructed that you can find intent by looking

25   at the circumstances.  I find that the reports

```
 1        of the victims and witnesses is accurate.
 2        Mr. Spencer threatened harm to the victims
 3        before he fired the gun.  He slowed or almost
 4        stopped the vehicle, retrieved a handgun, rolled
 5        the window down, pointed the handgun at the
 6        victim and pulled the trigger striking the
 7        victim.  I don't know how far away they were,
 8        but they were at least one car length away as
 9        viewed by the video.  Agreed everybody or not?
10             Because he had to pull it out far enough
11        to avoid the parked cars he drove behind.  So he
12        had to be one car length away.  And they were on
13        the sidewalk.
14             ATTORNEY KLOMBERG:  That's a reasonable
15        assumption, Judge.
16             THE COURT:  Am I misinterpreting the
17        video, Mr. Giesen?
18             ATTORNEY GIESEN:  I would say it appeared
19        to be at least 20 feet away.
20             THE COURT:  Okay.  So he was in a locked
21        vehicle.  He could have driven away.  He
22        deliberately and intentionally slowed down,
23        lowered the window, retrieved the gun, pointed
24        it and hit somebody.  The gun was a revolver.
25        Revolvers come in two different kinds, single
```

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 97 of 117   Document 6-14

action and double action.

What is the significance of that?  A single action has to be cocked.  So it's one thing to point the revolver at somebody.  When you cock it, you make the decision that you might fire it.  It takes a little effort to cock a revolver.  Once it's cocked, it might have a hair trigger or it might have a fairly heavy trigger.  That depends, but it takes a little effort to cock a 357 revolver.

Anybody disagree with that?

ATTORNEY KLOMBERG:  No.

THE COURT:  If it's a double action, then you don't have to cock it, but the trigger pull is a lot harder on a double action.  So if it's a double action, it didn't accidentally go off. It did not happen.  Because it takes a lot of trigger pull.  So one way or the other, it didn't accidentally go off.

Jared has a long history of mental health issues and a wide variety of diagnoses.  Common threads in his various diagnoses over the years include anxiety, depression, Attention Deficit and Hyperactive Disorder and control.  And I didn't bother to catalogue all of them, but

1    those are the ones that appear to come up

2    consistently all throughout his course of

3    treatment.

4         One of the more recent diagnoses which

5    resulted from his placement at Mendota Mental

6    Health Institute include Antisocial Personality

7    Disorder and malingering.

8         Malingering is commonly defined as

9    intentional production of false or grossly

10   exaggerated physical or psychological symptoms

11   motivated by external intents such as avoiding

12   work, obtaining financial compensation, aiding

13   criminal prosecution or obtaining drugs.

14        Antisocial Personality Disorder is

15   described as a disregard in violation of the

16   rights of others.  And I am not sure how much

17   the mental health community agrees on the

18   symptoms of Antisocial Personality Disorder or

19   whether it can be treated, but I think the

20   profession agrees that Antisocial Personality

21   Disorder people are likely to be irritable,

22   aggressive, as well as irresponsible.  Numerous

23   somatic complaints and, perhaps, attempt

24   suicide.

25        Due to their manipulative tendencies it's

difficult to tell whether they are lying or
telling the truth.  I got this from the
Psychology Today website.  And it's about the
same when I look at my copy of the DMS4, it's
pretty much the same.

Anybody disagree with what I said?

ATTORNEY KLOMBERG:  No.

THE COURT:  I'm not talking as a trained
mental health professional, I am just talking
about the basic generic terms for these
diagnoses.

Now, if one were to accept the validity
of these two diagnoses, one could conclude that
the primary explanation for his behavior is his
Antisocial Personality Disorder and his
malingering.

I also note that Antisocial Personality
Disorder is not normally ascribed to a minor or
a child.  So maybe that's why it didn't come up
on -- I'm just saying maybe that's why it didn't
come up earlier.  I don't know.  I do note when
I saw that, here's my reaction to it.

Mr. Spencer's mother reported that Jared
missed a lot of school because of stomach
problems, but the doctor's couldn't find

anything wrong with him; PSI, Page 15.

By his own admission he played sick a lot to get out of school; Page 16 of the PSI.

I already outlined his behavior problems. So when you look at the pattern of his behavior, and I don't want to repeat it all now, one could say okay, you made these two diagnoses dovetail, he missed school because he played sick and fooled his mom. He couldn't fool the doctors, but he fooled his mom.

He spent a lot of time at home doing his gaming which gaming in itself is okay, but now he is in a situation where I don't know if it is valid or not, but what he claims is he has these reactions to people invading his space. I'm not a mental health professional. I think it's a fascinating subject, but I don't have professional training on it. I am not going to pretend to be one here.

For the purpose of this sentencing, I am not going to prescribe any particular diagnosis to him because after reading all the reports, I don't know which one is valid and which isn't. And maybe they are all valid at the time and maybe they are not, I don't know, but it would

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 101 of 117   Document 6-14

be easy to conclude that those two are ones that really fit the conduct.

So let's assume for purposes of discussion that Mr. Spencer did not have Antisocial Personality Disorder or malingering. The assertion is made that he has these reactions to somebody intruding on his personal space and giving unwanted physical conduct.

The question is, as I analyze, how do we apply these facts to the sentencing? What's the risk to the public given those facts if I assume that those are true?

Under these circumstances releasing Jared Spencer into society, society which contemplates what, people. You don't have society without people. If you want to go to society, it implies interaction with people. If you want a homestead in Alaska and build a cabin and be a mountain man, different story. If you get a job as a forest ranger, in the middle of a forest on a tower with a pair of binoculars and you don't have to talk to anybody, different story, but that's not most people. One cannot go to work, attend a softball game, a flea market, go to school, go to a concert, go to a restaurant or a

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 102 of 117   Document 6-14

bar or a Summer Fest or the State Fair or the

County Fair without somebody, over all some

people do that still, without somebody

encroaching on your personal space.  I mean,

that's what happens when you are around people.

How likely is it that you are going to go

through daily routine without every once in

awhile bumping into somebody who is having a bad

day, who's got a bone to pick with somebody, who

maybe has had a few drinks too many, which we do

live in Wisconsin, and not having some mild

confrontation with somebody that's likely to

trigger Mr. Spencer's reaction.  I mean, it's

not going to happen.

You can't go to school, go to work, go

out in public without bumping into somebody or

occasionally bumping into somebody that wants to

pick an argument.  So if that what's going on

here, that doesn't paint a very good picture for

him, either.

So I can't make a finding that his

character and rehabilitative needs can be

addressed in a setting that is not custodial.

It hasn't worked so far when he was a child and

when you had more control over him.  Do I like

it?  No.  I think it's terrible, but I have to
look at the seriousness of the offense.

I don't think I should spend a lot of
time elaborating on the seriousness of the
offense, but for the grace of God it would have
been a homicide.  So 60 years in prison is the
max.

Now, if I say something and I misspeak, I
want to correct myself and I won't be offended
if you say wait a minute, Judge, you got that
wrong.

So how much time do I need to spend on
elaborating the seriousness of the offense is
way up there.  Not much.  The need to protect
the public, well, that needs to be developed a
little bit here because obviously when you shoot
somebody, the need to protect the public is a
major factor.  The question is can it be done in
some other setting.

And if Mr. Spencer can't take his meds
and we can't make sure he takes his med, that's
a big problem.  If he has this problem with
people invading his space and bumping into him
and getting into some kind of mild confrontation
with him, that's a problem.  Apparently it was a

problem all through school.  And then he quit
school.

So the problem was never addressed.  What
happened was he by his own statement got himself
out of school so he didn't have to bump into
somebody, he didn't have kids invading his
personal space.  Maybe that's why he doesn't
have more on his record.  I don't know.

All I know is this; when I look at the
need to protect the public, I cannot make a
finding based on his track record that it would
be a reasonable risk to put him on Probation.
The facts don't support it.  Too much at stake.
His track record just doesn't support it.  And I
wish I could, because I do not like the idea of
having to send somebody to prison at the age of
17.

And I analyzed all of the reports I read,
all the things that Mr. Giesen sent me and I
believe all the information that he sent me and
I'm not fighting it, I am endorsing everything
he said about brain development and mental
health treatment and all that, but when you pull
a gun and point it at somebody and pull the
trigger and hit somebody, most people expect you

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 105 of 117   Document 6-14

to go prison for a long time.

So the last thing is the character and rehabilitative needs of Mr. Spencer. And I don't have enough information here to know about the rehabilitative needs. And the reason I don't -- let's just put it this way; I don't have as much as I like. Because I know he has a long history of mental health issues.

I know that he has had a long course of treatment and I know he has had a number of different meds over the years. The treatment options have been there. They have been explored. They have been tried. We know that his placement at mental health has improved his condition greatly. Whether it has addressed -- whether the Mendota Mental Health treatment has or would or will address his conduct issues, I don't know. I don't have a report that says yes, we know why he does this and we are treating it.

His behavior has improved. His ability to interact has improved. A lot of improvement has resulted, but is that really addressing his reaction that he has to people, does it really address his ability to control his behavior, his

ability to behave himself when he is in custody, you can only draw so many conclusion from that.

Because I can't necessarily find that because he hasn't misbehaved lately, that once we cut him loose that he is not going to go back to the old behavior even with the treatment. It's not like having a broken leg where somebody can say I set the leg eight weeks ago and now he is good to go. It doesn't work that way.

So I don't know what rehabilitation or if there is a rehabilitation that's going to address his conduct. Still a question mark.

What about his character? Well, there is two Jared Spencer's. There is the good Jared Spencer and then there is the other one. And, unfortunately, the good Jared Spencer has to do the time with the other one. There is the Jared Spencer that is kind, he is very bright, I can tell by his statement that he's very bright.

He has excellent communication skills. He did well in school when he wanted to play football. He got an A in ceramics. And when he didn't want to do something, he got Ds and Fs. Am I right or wrong, mom and dad? So is he a bright person that can do well if he is in the

right surroundings and has -- I don't know if I
should say has a hammer hanging over his head or
has a terror out in front of him.

So I have to believe that he has the
ability to be productive and stay out of
trouble. He just hasn't been able to do it yet.
I haven't had that many people in here where
nobody was able to stand up and say there are
some good things about him. Those people are
really rare where they just can't say anything
good about them.

And I have had to say to a lot of moms
and dads and people sitting in that chair the
bad so and so is going to have to do the time
with the good one. That's just the way it is.
I can't just send half of you there.

Now, when I look at all three of those
factors, I almost wish Mr. Klomberg hadn't made
the recommendations that he did because I don't
want somebody to say yep, the Judge just latched
onto it because that's what he wanted. That is
not true. But I will tell you that if he were
an adult he'd be getting a lot more. He'd be
doing 25 minimum in.

So I have to give him some leniency,

1    which I am perfectly willing to do, but
    2    everything has to be put in perspective,
    3    everything has to be put into context.
    4          There is no context about the seriousness
    5    of the offense.  When you give me a context --
    6    okay, I'll give you one.  Some guy goes in the
    7    movie theater and he shoots 50 people.  And then
    8    you have Jared who shoots one.  So one is a lot
    9    less than 50.  Other than that kind of thing,
   10    you can't put pointing a gun at somebody and
   11    pulling a trigger and putting it into any
   12    context that has any mitigating circumstances
   13    behind it.  There aren't any.
   14          When I look at the seriousness of the
   15    offense, I can't come up with a lot of ways to
   16    say well, he isn't that bad.  Because it is bad.
   17          And there is a serious threat to the
   18    public.  I'm not saying he is a raving maniac.
   19    I'm saying the bad Jared Spencer isn't taking
   20    his meds.  And when he's in his mode that he
   21    does what he wants to do he is a danger to
   22    himself and others.
   23          So when I look at the concept that says
   24    we give leniency to juveniles because they are
   25    children and their brains aren't as developed, I

```
 1        have to put that in context.  And there is some

 2        context there.  If he were seven and he picked

 3        up a gun and shot somebody and he said to his

 4        grandma well, grandma people get shot on TV all

 5        the time, different story.  Because a

 6        seven-year-old doesn't understand permanency of

 7        death.  The seven-year-old turns the TV on the

 8        next day and the same people are all there.

 9            A 17-year-old is not in the going to be

10        held to that low of a standard.  If he were 18,

11        the standard of leniency wouldn't even a fly.

12            Now, science would tell you that 18 means

13        nothing.  Maybe it should be 22 or maybe it

14        should be 25.  And a lot of people would say it

15        should be 30.  Maybe it should.  But the point

16        is if we were a year older, we wouldn't be

17        talking about the Supreme Court Rules that says

18        you have to give leniency to a child.  So when I

19        talk about the leniency, I have to consider the

20        fact that he was 17 and not seven.

21            The other comments, there are three

22        Supreme Court cases that Mr. Giesen cited, or

23        two I think it was, dealt with mandatory life

24        imprisonment.  And we had a 14-year-old and I

25        think a 17-year-old, if I remember the facts
```

—110—

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 110 of 117   Document 6-14

1    right, that got convicted.  One was first degree

2    intentional homicide and the other was something

3    about the same category.  And the Statute in the

4    State at the time required mandatory life

5    without parole and the Supreme Court said no,

6    you can't do that to a child.

7         So it's not quite the same facts here

8    because we are not talking about life

9    imprisonment without parole, we are talking

10   about something a little less severe.  Severe

11   enough, but not quite the same offense.  But I

12   accept and believe in the concept that a

13   juvenile is entitled to leniency under the Law.

14   It is what it is.

15        The bottom line is this; I think the

16   minimum sentence that would do justice to the

17   need to protect the public and seriousness of

18   the offense, and I know that the family is

19   not -- nobody is going to like this.  I know the

20   victims aren't going to like it, either.

21        But these are the findings that I make

22   based on the facts that both parties gave me;

23   30 years in the Wisconsin State Prison, 15 in

24   and 20 out.

25        And I agree with what Mr. Klomberg said

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 111 of 117   Document 6-14

that the 15 years will give him time to let his
brain finish developing.  It's an amount of time
that is the minimum amount of time that would do
service to the need to protect the public and
the seriousness of the offense.

And the 20 years I think is appropriate
because I have -- I don't know enough about his
condition and the supervision that would be
required to be able to say how long he needs to
be on, but I can't make a finding that something
less than that would be appropriate, I guess is
the way to put it.

So I'm hoping that at the end of 15 years
Mr. Spencer is going to be in a position with
some educational training, which is available in
the prison and with the vocational training
that's available to him, to walk out that door
and he can hold his head up high and say I paid
my debt to society.  Now I am going to move on
and make something of my life.

Take advantage of whatever mental health
treatment is available to you when you get out
and stick with it.  And if you have to take
meds, take the meds and salvage the rest of your
life.  I think you have the ability to do it.

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 112 of 117   Document 6-14

And I also endorse Mr. Giesen's

          recommendation that it's possible the Wisconsin

          Resource Center would be something that needs to

          be seriously looked into.  I'm not going to tell

          the Department of Corrections how to run their

          institution, that's up to them.  They have

          trained professionals, but I think that

          Attorney Giesen makes a valid point and that

          needs to be explored.

                    I see no reason why Mr. Spencer would not

          be eligible for Substance Abuse and Challenge

          Incarceration.  I don't know the extent to

          which --

                    ATTORNEY KLOMBERG:  Your Honor.

                    THE COURT:  It's a disqualifying offence,

          isn't it?

                    ATTORNEY KLOMBERG:  It's a disqualifying

          offense.  He can't be eligible for the programs.

                    THE COURT:  That's too bad.

                    Mr. Spencer, you have the right to seek

          post-conviction relief.  If you decide to do so,

          proper paperwork has to be filed and served

          within 20 days.  Your lawyer will review those

          options with you.

                    Do you have any questions, sir?

—113—

```
 1              Mr. Giesen, anything else we need to
 2      address?
 3              ATTORNEY GIESEN:  No, Your Honor.
 4              THE COURT:  Mr. Klomberg.
 5              ATTORNEY KLOMBERG:  Just a couple
 6      clarifications, Judge.  The Court had pronounced
 7      30 years prison, but then said 15 --
 8              THE COURT:  It should be 35.  I'm sorry.
 9      My math escaped me for a minute.
10              ATTORNEY KLOMBERG:  And the Court has
11      already ordered the 738 days of credit?
12              THE COURT:  So Ordered.
13              ATTORNEY KLOMBERG:  It should be on the
14      Judgment.  Is the Court Ordering costs?
15              THE COURT:  Does it serve any purpose at
16      this point?
17              ATTORNEY KLOMBERG:  I always just ask for
18      it.
19              THE COURT:  I'm not going to -- I take
20      that back.  I'm not ordering a fine, but the
21      taxpayers are entitled to at least Court costs.
22              ATTORNEY KLOMBERG:  And the $38.98 in
23      restitution to Fleet Farm.
24              THE COURT:  So Ordered.
25              ATTORNEY KLOMBERG:  And the Court has to
```

1     order DNA.

2            THE COURT:  The State Law requires that a

3     DNA sample be provided.  With the cost of that

4     there is a DNA surcharge that has to be Ordered.

5     So that will also be ordered.

6            I wish the best of luck to Jared and

7     everybody else in this case.  Good luck.

8            Court is in recess.

9     MR. GIESEN:  Your Honor, if I may.  With

10    respect to DNA, they have already taken it.

11           THE COURT:  He only needs to do it once.

12           ATTORNEY KLOMBERG:  What would they have

13    taken it for?  He hasn't been convicted of a

14    crime before today.

15           THE COURT:  Well, at one time they were

16    taking it when they were taken into custody.  I

17    don't know.  He has to give a sample.  If he has

18    already done it, maybe he doesn't need to do it

19    twice.  It's my understanding it's not very

20    intrusive.  So I don't know how much of a

21    problem that's going to be, but, Mr. Giesen, if

22    you have a problem, you have my permission to

23    contact me and I'll straighten it out.

24           ATTORNEY GIESEN:  I would just make the

25    Order conditional and waive costs.  He has

```
 1        already given a sample at the Dodge County Jail.

 2              THE COURT:  I am Ordering he is giving a

 3        sample.  If he has already done it, I am not

 4        Ordering it twice.  I am required to Order that

 5        he provide a sample.

 6              ATTORNEY KLOMBERG:  It was just whispered

 7        in my ear about the appeal rights.  If you did,

 8        I'm not sure.

 9              THE COURT:  I did.  I reminded him that

10        he has 20 days to decide if he wants to seek

11        post-conviction relief.

12              Oh, what are the other -- Mr. Spencer,

13        this offense is a felony, upon conviction, which

14        happened awhile ago, you may not vote in any

15        election until your civil rights are restored.

16        Furthermore, it is unlawful for you to possess a

17        firearm.  Understood?  And body armor, if I

18        remember right.

19              ATTORNEY KLOMBERG:  This is a body armor

20        offense.

21              THE COURT:  Okay.  Court is in recess.

22                        (Which were all the proceedings

23                        had in the above-entitled cause

24                        this date and time.)

25
```

```
 1      STATE OF WISCONSIN  )
                           )SS:
 2      COUNTY OF DODGE     )

 3

 4

 5           I, KIMBERLY KEEL, Official Court Reporter

 6      for Dodge County Circuit Court, Branch III, do

 7      hereby certify that the foregoing transcript is

 8      a verbatim transcription of the proceedings held

 9      in the afore-entitled matter, in said Court, at

10      the Dodge County Justice Facility, Juneau,

11      Wisconsin, on July 21, 2017, the Honorable

12      JOSEPH G. SCIASCIA, Circuit Judge, presiding;

13      that it is a true and correct transcription of

14      my stenographic notes taken at said Hearing.

15

16

17      Dated this 14th day of September 2017

18

19

20      _____

21      Electronically signed by
        Kimberly Keel
22      Official Court Reporter
        Dodge County Circuit Court, Branch III

23

24

25
```

Case 2:21-cv-00326-LA   Filed 01/03/23   Page 117 of 117   Document 6-14