# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JARED L. SPENCER,
        Petitioner,

v.                                      Case No. 21-cv-0326

MICHAEL MEISNER,[1] *Warden,*
*Fox Lake Correctional Institution,*
        Respondent.

## DECISION AND ORDER

Petitioner Jared Spencer is a Wisconsin state prisoner currently incarcerated at Fox Lake Correctional Institution. In 2017, he pleaded guilty to attempted first-degree intentional homicide and was sentenced to fifteen years of confinement in state prison and twenty years of extended supervision. He petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 seeking a new sentencing hearing, claiming a violation of his due process right to be sentenced based on accurate information. Petitioner contends that the sentencing court relied on materially inaccurate information at sentencing, namely that he willfully refused his mental health medications while incarcerated.

## I. BACKGROUND

Petitioner has experienced a lifelong struggle with mental health issues. At age five, he was diagnosed with anxiety and depression and began undergoing therapy.

---

[1] At the time petitioner filed his amended petition, he was an inmate at the Wisconsin Resource Center. Sue Dehaan, as Director of the Wisconsin Resource Center, was named as respondent in this action. Petitioner is currently incarcerated at Fox Lake Correctional Institution, where Michael Meisner is Warden. Pursuant to Federal Rule of Civil Procedure 25(d), I will substitute Meisner for Dehaan as respondent.

Growing up, he struggled with irritability, poor impulse control, and other behavioral problems. Petitioner was diagnosed with oppositional defiant disorder (ODD) and attention-deficit/hyperactivity disorder (ADHD) and prescribed a myriad of medications over the years. However, petitioner took his medications inconsistently and began abusing alcohol and other drugs in his teenage years. Three weeks prior to the incident leading to his conviction, petitioner stopped taking his prescribed medications.

A.     **Shooting of Andrew Kruse**

On July 15, 2015, petitioner, then seventeen years old, shoplifted approximately $40 worth of ammunition from a Fleet Farm store in Beaver Dam, Wisconsin. Fleet Farm Assistant Manager Andrew Kruse and loss-prevention specialist Kendra Kunkel followed petitioner out of the store and into the parking lot. Off-duty police officer Bryce Berger, who had been shopping in the store that afternoon, and the store employees confronted petitioner, who was attempting to leave the property. While driving away, petitioner pulled a .38 revolver from the center console of his vehicle. He fired two shots out of the passenger-side window and drove away. One of the bullets struck Kruse, passing through his wrist and embedding in his shoulder. Kruse was transported to the hospital and received treatment for the wound.

B.     **First Stay in Dodge County Jail**

Petitioner was arrested, charged and held on cash bail in the Dodge County Jail. During his first stay in the jail, petitioner had documented behavioral issues and confrontations with jail staff, specifically with nursing staff regarding his medications. Petitioner's doctor prescribed him fluoxetine (Prozac), an antidepressant, and lithium carbonate, a medication for bipolar disorder. Both medications need be taken with food

in order for the body to properly absorb them and to avoid acid reflux and nausea. On several occasions, nursing staff at the jail failed to administer the medications in the correct dosage, at the correct time or in the manner prescribed (with food). On one occasion, jail staff failed to provide medications because they could not find the right dosage. ECF No. 10-10 at 10. For a period of approximately nine days, jail staff erroneously gave petitioner twice the proper dose of lithium carbonate. *Id.* at 11–12. And at least four times, the nurses gave petitioner his medications up to an hour before he received his food.[2] When this occurred, petitioner would request that the nurse come back

---

[2] Petitioner filed grievances with the jail documenting each of these incidents:

August 12, 2015:

> Yesterday, Nurse Terry came to pod B section 2 at approximately 5:00 p.m. to deliver medication. I told nurse Terry I could not take my medication on an empty stomach and asked that she return after dinner at the normal time. She stated that I have to take them now and I informed her that I often vomit when taking this medication on an empty stomach and that she needed to come back after dinner. She refused and closed the trap. After dinner I got on the intercom and asked when I could receive my medication. CO Harned informed me that I had refused my medication and would not be receiving it tonight. …

ECF No. 10-10 at 5.

August 15, 2015:

> Nurse Terry came to pod B section 2 at approximately 7:50 a.m. with medication. … I informed the nurse that I could not take my meds on an empty stomach and requested that she return after breakfast. She told me that I "know how it goes" and that she would not come back. I told her this was not ok because from previous experience I vomit when taking meds on an empty stomach. Furthermore, issuing meds at an improper time renders it less effective and is not appropriate. I asked if she was denying me my medication. She told me the conversation was over and shut the trap in my face. When breakfast was served and finished I requested my meds over the intercom. I was told nothing could be done as the nurse had left the pod. …

*Id.* at 6.

October 25, 2015:

> At 4:58 pm, Nurse Sheila delivered meds. She delivered my meds before trays were delivered. I have stated in the past I can't take this medication on an empty stomach. I asked her to please come back after dinner. She refused. Trays arrived at 5:19 pm. Please stop violating my doctors [sic] orders. Thank you.

*Id.* at 15.

December 26, 2015:

> This morning nurse Stephanie came before trays were delivered. I told her about the Head Nurse's orders to give my medication with milk. I have explained numerous times taking

after his meals. On all such occasions, staff marked down petitioner as having refused his medications and refused to return with them after he had eaten.

In a court ordered competency evaluation, Psychiatrist Craig Schoenecker found petitioner not competent to stand trial and diagnosed him with "unspecified depressive disorder and unspecified psychotic disorder." ECF No. 10-5 at 3 (December 16, 2015, Competency Report).

### C. Mendota Mental Health Institute

On April 6, 2016, petitioner was transferred to Mendota Mental Health Institute where he stayed for approximately three months. At Mendota, petitioner's condition improved significantly. Mendota staff adjusted his medications and ensured that he received the proper dosage, at the proper time and with food. As a result, staff never marked petitioner as having refused to take his medications.

Petitioner underwent another competency evaluation, was found competent and was subsequently transferred back to the Dodge County Jail. Petitioner voiced concerns that his transfer back to the jail would result in further issues with his medications. In response, the circuit court entered an order requiring that the jail continue petitioner's medication regimen from Mendota of "Lithium (300 mg. twice per day), Fluoxetine (60 mg. per day), Quetiapine (100 mg. per day, and also 25 mg. to be available as needed up to once every eight hours for agitation)." ECF No. 10-8.

---

> my meds w/o food causes me to vomit. She told me I was refusing my meds. After trays were delivered I looked out the window and saw Nurse Stephanie still on the pod. I requested she give me my meds now that I had my milk. CO Harkins informed me that she had already been to this section. She had no "evidence" of the Head Nurse's orders, and so "that time has passed." …

*Id.* at 16.

**D. Second Stay in Dodge County Jail**

Upon return to the jail, petitioner again experienced issues with the administration of his medications. During his time at Mendota, petitioner was prescribed an additional medication, an antipsychotic medication called Quetiapine (Seroquel). A common side effect of Seroquel is extreme drowsiness, so doctors ordered that petitioner take the medication at bedtime. Jail nursing staff distribute medications to inmates in a series of scheduled medications passes throughout the day. Second medications pass at the Dodge County Jail occurs just after dinner. Petitioner informed jail staff that he could not receive Seroquel during second medications pass because the medication made him extremely tired and would cause him to fall asleep prior to head count at 9:30 p.m., which would in turn result in a rules violation and disciplinary action. Jail staff told petitioner that he could take the Seroquel when given, or he would not receive it at all, and that he would be marked as having refused his medication. Petitioner requested to receive his Seroquel during the special late medications pass, around 9:00 p.m., for inmates with diabetes and an inmate who needed a nebulizer. Jail staff refused, again stating that petitioner had to take the Seroquel during the after-dinner medications pass or not at all. On at least two occasions, petitioner was marked as "refusing" his Seroquel.[3]

---

[3] May 22, 2017:

> On Saturday, May 20th, the second shift nurse, Shelly, refused to give me my medications as prescribed. The nurse came around 8:30 pm to do her first med pass, which is the second med pass of the day. … I said through the trap, "I have to take my meds on the third med pass. I'll see you later, thank you," and walked away expecting to receive my meds on the third med pass as prescribed. I waited until about 10:15 pm then I pressed the intercom and told the CO in master control I had not yet received my meds. She called the nurse and told me that the nurse said I refused my meds. ...

ECF No. 10-10 at 20.

July 11, 2017:

> On July 11th at 7:20 pm the section 2 trap opened. I went over and saw that Nurse Shelly was doing med pass. I asked if she would be returning with my medications as she has

### E. Guilty Plea and Sentencing

On April 18, 2017, petitioner pleaded guilty to attempted first degree intentional homicide in violation of Wisconsin Statute § 940.01(1)(a), and the State agreed to dismiss and read in all other charges against him. The state further agreed to recommend no more than fifteen years initial confinement and the maximum period of extended supervision, twenty years.

On July 21, 2017, the Dodge County Circuit Court sentenced petitioner to fifteen years of initial confinement and twenty years of extended supervision, the maximum he could receive under the plea agreement. In pronouncing its sentence, the court made numerous statements demonstrating its belief that petitioner willfully refused his medications while incarcerated at the jail:

> After this incident happened . . . after he had been arrested, he flooded his cell, threw water, he didn't think it was a big deal. ***And he refused his meds***.
>
> ... I realize 17-year-olds do that stuff all the time, but one would think that when you are in jail for having shot somebody and you realize that you quit taking your meds three weeks ago, that this would be a good time to just do what you are told for once.
>
> ***By refusing his meds, he sent a signal to the staff that he does what he wants when he wants. If he doesn't want to take his meds, he is not going to take his meds***.

---

> had issues giving me my medications as prescribed in the past. I told her that it was only 7:20 pm, over an hour earlier than the earliest I am supposed to receive my medication. She said she might not be able to make it back and so if I didn't take my medication at that time she would mark it as a refusal. I told her I was not refusing my medication in any way but that I needed it as prescribed. Nurse Shelly slammed the trap as I was speaking to her. … [A]t 9:25 p.m. I pressed the intercom. CO Harned answered and I asked him if the nurse had come back with my medication. He told me the nurse was not coming back with my medication so "do what you gotta do." I asked if the nurse had come back for anyone else and he informed me she had come back for "a couple" of people. …

*Id.* at 21–22.

>
> And the reason that I am mentioning that is that it ties in with what got us here. He had a mom, a dad, school, people, counselors, any number of counselors working with him. He could not or would not take his meds. And when I am sitting here trying to decide what do we do with Jared now, and ***I find in the report that when he was in jail after he had been arrested and was offered and prompted to take his meds, he refused to take them***. …
>
> Jared Spencer doesn't want to take his meds. Never did. The question is will he ever. Now we are in a situation where I have to weigh his ability to stick with the meds against the public's safety. And I am being asked to roll the dice and he has no good track record whatsoever for me to look back on and say yeah, he can do this.
>
> If it hadn't been for the incident in jail, I'd say maybe, but that is a big—to me that is a very important fact here. ***You can't do it when the jailer prompts you to do it, it's not going to happen***.

Sentencing Tr. at 89:16–91:14, ECF No. 6-14 (emphasis added).

> ***Here are the facts that I think are most pertinent to my decision.*** Mr. Spencer has a long history of mental health issues. A long history of mental health medications and treatment. Facts tend to indicate that his condition improves when he is on the right meds and when he takes them. He does not always consistently take his meds. He stated that he stopped taking his meds a few weeks before this happened.
>
> His mom said she put the meds out, assumed he was taking them, which implies to me that it's not just recently that he quit, but maybe he hasn't been taking them all along, but that I am not sure about.
>
> Mom reports that his mood was horrible when he stopped taking his meds. And lastly, which I already commented, ***he refused to take his meds even when prompted to do so in jail***.

*Id.* at 92:18–93:11 (emphasis added).

> There is no reason at this time to believe that any level of supervision will ensure the safety of the public. ***Mr. Spencer cannot be trusted to take his meds as prescribed.*** And I am not aware of any amount of the supervision outside a custodial setting that would be adequate. I don't buy the argument. The facts don't support the argument that he can take his meds as prescribed without being in custody. ***He doesn't always take them when he is in custody***.

7

Case 2:21-cv-00326-LA   Filed 04/26/24   Page 7 of 16   Document 21

*Id.* at 96:6–96:16 (emphasis added). The state did not argue at sentencing that petitioner had refused his medications while incarcerated, but the circuit court considered materials referencing the "refusals." *See* ECF No. 10-6 at 5 (April 8, 2016, Competency Report stating that petitioner "often refused medication while in jail."); ECF No. 10-3 at 12 (Pre-Sentence Investigation Report).

**F.     Postconviction Motions and Appeal**

On October 5, 2018, petitioner filed a postconviction motion seeking sentence modification under state law or resentencing due to the sentencing court's reliance upon inaccurate information at sentencing. Petitioner argued that the court's repeated claims that he had refused to take his medications while incarcerated and therefore could not be trusted to take them when released were inaccurate and violated his due process right to be sentenced on the basis of accurate information. The sentencing court denied the motion without a hearing, stating that even if it did rely on inaccurate information, its error was harmless.

On appeal, the Wisconsin Court of Appeals affirmed. It assumed without deciding that the sentencing court relied upon inaccurate information but found the error harmless, stating that there was "no reasonable probability that the court's reliance on inaccurate information that [petitioner] refused his medications while in jail contributed to the sentence it imposed." *State v. Spencer*, 942 N.W.2d 496, ¶ 20 (Wis. App. 2020). The court of appeals reasoned that:

> [T]he circuit court considered evidence that Spencer had refused his medications while in jail along with evidence as to Spencer's history of noncompliance with his medications while in the community. The court determined that confinement was necessary because Spencer had a long history of noncompliance with his medications and of corresponding behavioral issues. While the court found significant to its analysis that

> Spencer had refused his medications while in jail, it also relied on Spencer's history of noncompliance in the community in determining that confinement was necessary. Significantly, the court relied on evidence that Spencer had decided to stop taking his medications for several weeks prior to the shooting. Thus, the court's reliance on the underlying fact of Spencer's historical failure to comply with his medications and his resulting dangerous behavior remains undisturbed absent the court's reliance on Spencer's failure to take his medications while in jail. We therefore conclude that the State has met its burden to establish that the sentence would have been the same absent the inaccurate information.

*Id.*, ¶ 21. The court of appeals concluded that because the sentencing court explained the rationale for its sentence independent of its reliance on the inaccurate information that petitioner refused his medications in jail, there was "no reasonable probability that the sentence would have been different absent the error." *Id.*, ¶ 22. The Wisconsin Supreme Court denied review.

## II. DISCUSSION

The authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Under AEDPA, a federal court may grant habeas relief only if the state court's decision on the merits of the petitioner's claim was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Miller v. Smith*, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. § 2254(d)(1), (2)). "This provision means that on habeas review, federal courts are usually limited to a deferential review of the reasonableness, rather than the absolute correctness, of a state court decision." *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012). I review the decision of the

Wisconsin Court of Appeals, as the decision of the "last state court to rule on the merits of the petitioner's claim." *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006).

A.     **Due Process Violation – Inaccurate Information at Sentencing**

Under the Fourteenth Amendment's Due Process Clause, a criminal defendant is constitutionally entitled to be sentenced only upon proper and accurate information. *United States v. Tucker*, 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736 (1948). "A convicted offender does not have a constitutional right to a particular sentence available within a range of alternatives, but the offender does have a right to a fair sentencing process—one in which the court goes through a rational procedure of selecting a sentence based on relevant considerations and accurate information." *U.S. ex rel. Welch v. Lane*, 738 F.2d 863, 864–65 (7th Cir. 1984) (citing *Tucker*, 404 U.S. at 447; *Townsend*, 334 U.S. at 741). Under *Townsend* and *Tucker*, a sentence must be set aside where the defendant can show that false information was part of the basis for the sentence. *Id.* at 865. "The two elements of that showing are, first, that information before the sentencing court was inaccurate, and second, that the sentencing court relied on the misinformation in passing sentence." *Id.*

Petitioner contends that he was deprived of due process because the sentencing court relied on materially inaccurate information, namely that he refused to take his prescription medications while he was in jail. I review this issue de novo because the court or appeals did not analyze its merits, but rather assumed that the sentencing court did in fact rely on materially inaccurate information. *Harris v Thompson*, 698 F. 3d 609, 623 (7th Cir. 2012) ("Where the state courts did not reach a federal constitutional issue, 'the claim is reviewed de novo.'" (quoting *Cone v. Bell*, 556 U.S. 449, 472 (2009)).

10

Case 2:21-cv-00326-LA   Filed 04/26/24   Page 10 of 16   Document 21

Not all inaccuracies deprive a defendant of due process; "the incorrect information must be 'materially untrue.'" *Promotor v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010) (quoting *Townsend*, 334 U.S. at 741). In the present case, the information presented to the sentencing court was materially untrue. While jail staff marked petitioner as having refused his medications, the evidence indicates that these notations were incorrect. Rather, petitioner's "refusals" were attempts to take his medications in the manner prescribed by his doctors. Respondent does not genuinely dispute that petitioner did not refuse his medications but rather asked jail personnel to administer them as ordered by his physicians. Instead, respondent points out that petitioner sometimes failed to take his medications while in the community, a fact which is uncontested but has no bearing on the falsity of the assertion that petitioner refused medications while incarcerated. The sentencing court found both that petitioner had stopped taking medications while in the community and had refused them while incarcerated, and that these failures exacerbated each other. Thus, the information before the sentencing court was materially inaccurate.

"A sentencing court demonstrates actual reliance on misinformation when 'the court 'gives explicit attention' to it, 'founds' its sentence 'at least in part' on it, or gives 'specific consideration' to the misinformation before imposing sentence.'" *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003) (quoting *Tucker*, 404 U.S. at 447). Here, the sentencing court clearly gave explicit attention and specific consideration to the inaccurate information in imposing sentence. The court mentioned petitioner's refusal to take his medications while in jail no less than six times. Its conclusion that petitioner posed a danger to the public was premised in substantial part on the inaccurate information that petitioner had refused to take his medications during his two-year incarceration in the jail

11

Case 2:21-cv-00326-LA   Filed 04/26/24   Page 11 of 16   Document 21

prior to sentencing. This inaccurate information contributed to the court's conclusion that petitioner could not be trusted. But the truth is that, with respect to his medications, petitioner was scrupulously following his doctor's directions. The sentencing court made clear that its sentence hinged on the false information, stating that it was "a very important fact here." Sentencing Tr. at 91:12, ECF No. 6-14.

Respondent argues that the circuit court founded petitioner's sentence on other accurate information that supported its determination, regardless of the truth of whether petitioner refused his medications in jail. In *Welch*, the Seventh Circuit rejected a very similar argument:

> The respondents argue that, in light of the sentencing hearing as a whole, the false information did not form the basis for the sentence. … but respondents' argument simply misconceives the nature of the due process right at stake here. The Supreme Court in [] *Tucker*, [] rejected an argument like the one advanced here. There the government argued that the sentence need not be set aside because, in light of the entire record, it was "highly unlikely" that the new, untainted sentence would be any different. 404 U.S. at 446. The Court held that resentencing was required because it simply could not be assumed that the sentencing court would again give the same sentence. 404 U.S. at 448–49, n.8.
>
> It was, of course, entirely proper for the sentencing court to take into consideration each of the factors noted by the respondents; each of these reasons may be relevant in selecting a sentence designed to rehabilitate the offender, protect the public and deter other crimes. But the fact that the other information might have justified the sentence, independent of the inaccurate information, is irrelevant when the court has relied on inaccurate information as part of the basis of the sentence. … The reviewing court cannot independently review the accurate information and conclude that the original sentence was still justified. That would be sheer speculation in reconstructing the sentencing court's thought processes.

738 F.2d at 867. Petitioner has shown that he was sentenced in substantial part on the basis of inaccurate information. I therefore conclude that his right to due process was violated.

## B. The Wisconsin Court of Appeals' Determination of Harmless Error

Because the Wisconsin Court of Appeals based its decision on harmless error, I must also determine whether that analysis was a reasonable application of the standard established in *Chapman v. California*, 386 U.S. 18 (1967). *Fry v. Pliler*, 551 U.S. 112, 119. (2007). ("[W]hen a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable."). Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24.

I find that the court of appeals' harmless error analysis was an unreasonable application of *Chapman*. The court of appeals unreasonably considered only the effect of removing the inaccurate information and failed to consider the potential positive effect that accurate information could have on petitioner's sentence. Petitioner was trying to take his medication as prescribed. He sought to take his medications at the proper time, in the proper dosage and as directed. He filed grievances indicating that he was serious about taking his medications correctly. The truth about petitioner's conscientious effort to take his medications in accord with his doctors' orders entirely undermines the sentencing court's rationale that petitioner was untrustworthy and could well have led to a more favorable sentence.

In finding harmless error, the court of appeals noted that petitioner's decision to stop taking his medications in the weeks leading up to the shooting alone justifies the sentence. *Spencer*, 942 N.W.2d 496, ¶ 21 ("the court's reliance on the underlying fact of Spencer's historical failure to comply with his medications and his resulting dangerous

13

behavior remains undisturbed absent the court's reliance on Spencer's failure to take his medications while in jail."). But, as petitioner argues, "non-compliance with medications prior to the shooting and refusal to take medications in the jail following arrest are not simply two unrelated facts, for which one can be removed and the sentencing result should be the same." Pet'r's Br. at 27, ECF No. 14. Indeed, the sentencing court at sentencing considered them to be related facts:

> ***Jared Spencer doesn't want to take his meds. Never did. The question is will he ever.*** Now we are in a situation where I have to weigh his ability to stick with the meds against the public's safety. And I am being asked to roll the dice and he has no good track record whatsoever for me to look back on and say yeah, he can do this.
>
> ***If it hadn't been for the incident in jail,*** I'd say maybe, but that is a big— to me that is a very important fact here. ***You can't do it when the jailer prompts you to do it, it's not going to happen.***

Sentencing Tr. at 91:2–91:14, ECF No. 6-14 (emphasis added). The sentencing court determined that petitioner could not be trusted to take his medications in the future based **both** on his failure to take them prior to the shooting and when he was in jail. It is unreasonable to conclude, that if the court had considered accurate information, the sentence would have been the same.

*Tucker* is illustrative on this point. There, the Supreme Court upheld an order for resentencing where the district court had given explicit attention to the defendant's three previous felony convictions in handing down a twenty-five-year sentence. *Tucker*, 404 U.S. at 444–45. When it was later determined that two of the three prior convictions were constitutionally invalid because they were obtained without the benefit of counsel, Tucker sought resentencing. The district court denied the motion. On appeal, the Ninth Circuit applied the *Chapman* harmless error standard and found that there was a reasonable

14

Case 2:21-cv-00326-LA   Filed 04/26/24   Page 14 of 16   Document 21

behavior remains undisturbed absent the court's reliance on Spencer's failure to take his medications while in jail."). But, as petitioner argues, "non-compliance with medications prior to the shooting and refusal to take medications in the jail following arrest are not simply two unrelated facts, for which one can be removed and the sentencing result should be the same." Pet'r's Br. at 27, ECF No. 14. Indeed, the sentencing court at sentencing considered them to be related facts:

> ***Jared Spencer doesn't want to take his meds. Never did. The question is will he ever.*** Now we are in a situation where I have to weigh his ability to stick with the meds against the public's safety. And I am being asked to roll the dice and he has no good track record whatsoever for me to look back on and say yeah, he can do this.
>
> ***If it hadn't been for the incident in jail,*** I'd say maybe, but that is a big— to me that is a very important fact here. ***You can't do it when the jailer prompts you to do it, it's not going to happen.***

Sentencing Tr. at 91:2–91:14, ECF No. 6-14 (emphasis added). The sentencing court determined that petitioner could not be trusted to take his medications in the future based **both** on his failure to take them prior to the shooting and when he was in jail. It is unreasonable to conclude, that if the court had considered accurate information, the sentence would have been the same.

*Tucker* is illustrative on this point. There, the Supreme Court upheld an order for resentencing where the district court had given explicit attention to the defendant's three previous felony convictions in handing down a twenty-five-year sentence. *Tucker*, 404 U.S. at 444–45. When it was later determined that two of the three prior convictions were constitutionally invalid because they were obtained without the benefit of counsel, Tucker sought resentencing. The district court denied the motion. On appeal, the Ninth Circuit applied the *Chapman* harmless error standard and found that there was a reasonable

14

Case 2:21-cv-00326-LA   Filed 04/26/24   Page 14 of 16   Document 21

probability that the defective prior convictions may have led the trial court to impose a heavier prison sentence than it otherwise would have imposed, and thus was unable to conclude that the reception of such evidence was harmless beyond a reasonable doubt. *Tucker v. U.S.*, 431 F.2d 1292, 1294 (9th Cir. 1970), *aff'd*, 404 U.S. 443 (1972). The Supreme Court considered whether the sentence might have been different if the sentencing judge had known that at least two of the defendant's previous convictions had been unconstitutionally obtained:

> We agree with the Court of Appeals that the answer to this question must be 'yes.' For if the trial judge in 1953 had been aware of the constitutional infirmity of two of the previous convictions, the factual circumstances of [Mr. Tucker's] background would have appeared in a dramatically different light at the sentencing proceeding. Instead of confronting a defendant who had been legally convicted of three previous felonies, the judge would then have been dealing with a man who beginning at age 17, had been unconstitutionally imprisoned for more than ten years, including five and one-half years on a chain gang.

*Tucker*, 404 U.S. at 448. Here, as in *Tucker*, when the inaccurate information is corrected, the factual circumstances of petitioner's background "would have appeared in a dramatically different light at the sentencing proceeding." *Id.* It was, therefore, unreasonable for the court of appeals to conclude beyond a reasonable doubt that petitioner's sentence would not have been different absent the error.

### C.     Harmless Error under *Brecht*

Before a writ of habeas corpus may be granted in a § 2254 proceeding, the federal court must assess the prejudicial impact of the constitutional error under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Fry*, 551 U.S. at 119–20. I first note that it is unclear as to whether *Brecht* even applies to a constitutional error occurring during sentencing. Assuming that it does, under *Brecht*, a constitutional error is harmless

unless it "had substantial and injurious effect or influence" in determining the outcome, meaning the error must have caused "actual prejudice." 507 U.S. at 623, 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). For the reasons previously discussed, the sentencing court's reliance on inaccurate information clearly caused petitioner to suffer actual prejudice. As stated, reliance on accurate information might well have resulted in a more favorable sentence.

## III. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the petition for a writ of habeas corpus is **GRANTED**, and that the respondent shall release the petitioner unless the State of Wisconsin resentences him within 90 days.

Dated at Milwaukee, Wisconsin, this 26th day of April, 2024.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge